**John E. JOSEPH, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 88–1139.

District of Columbia Court of Appeals.

Argued Oct. 18, 1989.
Decided Sept. 13, 1991.

Calvin Steinmetz, appointed by this court, with whom Anita Isicson, Washington, D.C., was on the brief, for appellant.

Joyce J. Bang, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, and Elizabeth Trosman and J. Edward Agee, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee. Gerald W. Heller, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellee.

Before TERRY and STEADMAN, Associate Judges, and PRYOR, Senior Judge.

TERRY, Associate Judge:

Appellant Joseph was indicted on charges of assault with intent to kill while armed[1] and carrying a pistol without a license.[2] After a jury trial, he was convicted of assault with a dangerous weapon[3] (as a lesser included offense of assault with intent to kill while armed) and carrying a pistol without a license.[4] On appeal Joseph contends that the government constructively amended the first count of the indictment in such a way that he was convicted of an offense with which he had not been charged by the grand jury. He also argues that the trial court erred in denying his motion for new trial based on claims of ineffective assistance of counsel and newly discovered evidence. We agree that there was a constructive amendment, but we find it harmless because it did not relate to the offense of which the jury actually found Joseph guilty. We find no other error, and accordingly we affirm the judgment of conviction.

## I

The evidence at trial established that on October 21, 1986, shortly after midnight, a gunfight occurred at the Baseball Club,[5] a bar on Eleventh Street, N.W. A few minutes earlier, appellant Joseph and Anthony Dickey, both of whom were seen with guns in the club that night, became embroiled in a heated argument. Joseph threatened to kill Dickey,[6] pulled out a gun, and told everyone to "get out." The other customers quickly fled. Dickey also started to leave, but just as he went out the door, Joseph fired a shot at him from inside the club. Dickey fell wounded in the front yard of a nearby church. As Joseph kept shooting, bullets from his gun struck Pamela Swann and then James Richardson, both of whom were just outside the front door.[7] At the same time, Morris Yarborough fired a gun toward the club from the outside. Both Joseph and Yarborough were wounded in the melee, along with Richardson, Swann, and Dickey. Richardson's injuries, however, were the most serious; one of the two bullets that hit him left him a paraplegic. The police found a total of nine empty shells at various places inside and outside the club.

The first count of the indictment read as follows:

On or about October 21, 1986, within the District of Columbia, John E. Joseph, while armed with and having readily available a pistol, assaulted another with the intent to kill him.

While there were multiple victims and the indictment charged only one assault without naming a victim, defense counsel did not request a bill of particulars before trial because the prosecutor had told her that the case would be tried as an assault on James Richardson with the intent to kill Anthony Dickey, on a theory of transferred intent.[8] Richardson, the most seriously wounded of the victims, would be the sole

1. D.C.Code §§ 22–501 and 22–3202 (1989).

2. D.C.Code § 22–3204 (1989).

3. D.C.Code § 22–502 (1989).

4. A co-defendant, Morris Yarborough, was separately charged in the same indictment with the same two offenses. Yarborough was tried with Joseph and acquitted of all charges.

5. The name of the club is variously stated in the record as the Baseball Club, the Ball Park Club, the Ball Club, and the Indian Athletic Ball Club. We have no way of knowing which is correct, but "Baseball Club" and "Ball Club" are the names most often used in the testimony. We shall refer to the establishment as the Baseball Club throughout this opinion.

6. Joseph was heard to tell Dickey, "If you say another word, I'll blow your goddamn head off."

7. Swann, who was shot in the leg, testified that she did not see who shot her. Richardson, however, testified that he was shot by the same man who had shot Dickey and Swann. He identified Joseph as that man, both from a photographic array and in open court.

8. See O'Connor v. United States, 399 A.2d 21, 24–26 (D.C.1979).

complainant.[9] At trial the government did indeed present evidence tending to prove an assault on Richardson with the intent to kill Dickey.

After the close of all the evidence, the trial court *sua sponte* raised a question about the unusual wording of the indictment—*i.e.*, its failure to name a specific victim—and its effect on the jury instructions:

> And here is my Fifth Amendment problem. If I simply put in the names of complainants, that is, instruct them as a matter of law that they must ... find beyond a reasonable doubt that with respect to Mr. Joseph, did he have the specific intent to kill Mr. Anthony [Dickey], or the specific intent to kill Mr. Richardson, or specific intent to kill Pamela— Ms. Swann, it seems to me that I am coming fairly close to invading the province of the grand jury. Because I don't know on what theory the government presented these cases and whether or not the grand jury, in fact, thought those victims were the ones whom Mr. Joseph intended to kill, or they found the probable cause to believe it was one of those enumerated victims.

After further discussion with counsel, the court decided to deal with the ambiguous nature of the indictment in its instructions to the jury. The court later charged the jury as follows:

> [T]he offense of assault with intent to kill [while] armed ... necessarily includes the lesser offense of assault with a dangerous weapon.
>
> \* \* \* \* \* \*
>
> You should first consider whether or not the defendant in this case, Mr. Joseph, is guilty of a greater offense, that is, of assault with intent to kill while armed. That is the ... *assault on Mr. James Richardson with the specific intent to kill Mr. Dickey.* That's the greater offense.
>
> \* \* \* \* \* \*
>
> If you find that the government has not proven each and every element of the greater offense ... then and only then, you are to then go on and separately consider whether or not the defendant is guilty of the lesser offense of assault with a dangerous weapon, the elements of which I have already defined to you. [Emphasis added.]

The jury found Joseph guilty of assault with a dangerous weapon and carrying a pistol without a license.

## II

The Grand Jury Clause of the Fifth Amendment states: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." To safeguard this right, the courts have held that an indictment must provide every defendant with three basic protections. "First, it must apprise the accused of the charges against him so that he may adequately prepare his defense, and second, it must describe the crime with sufficient specificity to enable him to protect against future jeopardy of the same offense.... [Third, by] guaranteeing the right to be tried only on charges made by the indictment, the [Grand Jury Clause] also protects against oppressive actions of the prosecutor or a court, who may alter the charge to fit the proof." *Scutchings v. United States,* 509 A.2d 634, 636 (D.C.1986) (citations omitted). Joseph argues that these protections were not afforded to him in this case, in that he was tried for and convicted of a crime different from that for which he was indicted. We conclude that he was so tried, but not that he was so convicted.

It is settled beyond all doubt that an indictment, once it has been returned, cannot be broadened or materially altered except by the grand jury itself. *Ex parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887). There are two basic types of alteration of an indictment:

> An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the

---

**9.** Dickey did not testify at trial.

grand jury has last passed upon them. A *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment.

*Gaither v. United States*, 134 U.S.App. D.C. 154, 164, 413 F.2d 1061, 1071 (1969) (emphasis in original; footnotes omitted), quoted in *Scutchings, supra,* 509 A.2d at 636.

In *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the Supreme Court identified what has come to be known as a constructive amendment of an indictment. The defendant in *Stirone* was convicted of interfering with interstate commerce by extortion, in violation of the Hobbs Act. The only interstate commerce mentioned in the indictment was the importation of sand into Pennsylvania, but the evidence at trial also showed interference with the exportation of steel from Pennsylvania. The judge instructed the jury that it could base a conviction upon interference with either the importation of sand or the exportation of steel.

The Supreme Court, without making any inquiry into prejudice, unanimously held that the divergence between the indictment and the evidence at trial was a violation of the defendant's Fifth Amendment right to an indictment by a grand jury. Explaining why this divergence was more substantial than a simple variance, the Court said:

> While there was a variance in the sense of a variation between pleading and proof, that variation here destroyed the defendant's substantial right to be tried

only on charges presented in an indictment returned by a grand jury.

*Id.* at 217, 80 S.Ct. at 273. Since *Stirone,* this court and others have held that a variance "becomes a constructive amendment when facts introduced at trial go to an *essential element* of the offense charged, and the facts are different from the facts that would support the offense charged in the indictment." *Giles v. United States,* 472 A.2d 881, 883 (D.C.1984) (emphasis in original), citing *Stirone.* Our decision in *Scutchings,* moreover, makes clear that, for the purpose of determining whether there has been a constructive amendment, the identity of the victim is an "essential element." [10]

■ Appellant Joseph was convicted of assault with a dangerous weapon as a lesser included offense of assault with intent to kill while armed, as charged in the first count of the indictment. That count alleged that Joseph had "assaulted another with intent to kill him." As a matter of basic grammar and syntax, the words "another" and "him" must refer to the same person. The word "him," being a pronoun, must have an antecedent, and the only possible antecedent in this entire count is "another." Thus the person whom Joseph allegedly intended to kill was necessarily the same person whom he assaulted. Given the evidence of record, the grand jury must have found either (1) that Joseph, while armed with a dangerous weapon, assaulted Anthony Dickey with the intent to kill Anthony Dickey, or (2) that, while so armed, he assaulted James Richardson with the intent to kill James Richardson.[11]

---

**10.** In *Scutchings* the defendant was indicted for obstruction of justice after allegedly threatening Michael Dobbins, a government witness in a case against him. At trial, however, the government attempted to prove the obstruction of justice through evidence that the defendant had attempted to bribe Patricia Dobbins, Michael's mother. We reversed the conviction, holding that the presentation of this evidence amounted to a constructive amendment of the indictment:

> Where, as in this case, a grand jury specifically charges essential elements of a crime, such as means and party, and the government, bolstered by the trial court's instructions, proves entirely different elements, the disparities

constitute a constructive amendment of an indictment.

*Scutchings v. United States, supra,* 509 A.2d at 638.

**11.** James Richardson and Anthony Dickey are the only possible victims to whom this count of the indictment could apply. There is no evidence that Joseph intended to kill either Pamela Swann or Morris Yarborough. In fact, it is difficult even to say that an intent to kill was established as to Richardson, since the evidence at trial established that Joseph had harsh words only with Dickey and that Dickey was the *true* target for his gunshots. We assume, however, for the purpose of this discussion, that the pros-

But that is not what the government proved at trial. At the beginning of the trial, defense counsel, after questioning the ambiguous wording of the indictment, was assured that the government was proceeding on a theory that Joseph assaulted Richardson with the intent to kill Dickey. During the trial, the prosecutor placed great emphasis on the fight between Joseph and Dickey in order to establish that Joseph intended to kill Dickey; the shooting of Richardson was portrayed as a mere by-product of that intent. In his summation the prosecutor said that "defendant Joseph is charged with ... assault on James Richardson with the intent to kill Anthony Dickey, the specific intent to kill Anthony Dickey." He then asked a rhetorical question, "Well, who do you think Joseph [was] trying to kill?" and answered it, "He intended to kill Anthony Dickey...." Finally, the trial judge, in his instructions quoted at page 16, *supra,* directed the jury to consider whether Joseph assaulted Richardson with the specific intent to kill Dickey.

On this record we can come to only one conclusion: that the government's evidence at trial constructively amended the indictment, in violation of the Supreme Court's holding in *Stirone v. United States, supra.* The grand jury necessarily alleged in count one that Joseph intended to kill the person whom he assaulted, but that is not what the government proved at trial. What happened here was a violation of Joseph's Fifth Amendment right to an indictment by a grand jury, contrary to an unwavering line of precedents going back more than one hundred years to the Supreme Court's unanimous decision in *Ex parte Bain.* "The *Bain* case, which has never been disapproved, stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States, supra,* 361 U.S. at 217, 80 S.Ct. at 273 (citations omitted); *see Ingram v. United States,* 592 A.2d 992, 1005 (D.C.1991) (amendment of indictment "changes its charging terms ... and is *per se* reversible error," citing *Bain* ).

 What saves this conviction from reversal, however, is the fact that Joseph was convicted of only a lesser included offense. In *United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), the Supreme Court held that despite a variance between the language in the indictment and the actual proof at trial, the defendant's conviction should be affirmed because the offense *of which he was actually convicted* was properly alleged in the indictment.

> As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime.... Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment.

*Id.* at 136, 105 S.Ct. at 1815 (citations omitted). Applying *Miller* to the instant case, we note that Joseph, although indicted for assault with intent to kill while armed, was actually convicted of assault with a dangerous weapon (ADW). Under *Miller,* the phrase "with intent to kill him" was thus "unnecessary to and independent of the allegations of the offense proved [ADW]" and may be disregarded as "surplusage." *Id.* at 136–137, 105 S.Ct. at 1815, citing *Ford v. United States,* 273 U.S. 593, 602, 47 S.Ct. 531, 534, 71 L.Ed. 793 (1927). Since the constructive amendment that occurred in this case affected only the identity of the "him" in "with intent to kill him," we see no way in which it could have infringed Joseph's constitutional rights with respect to the crime of which he was in fact convicted. There can be no doubt that the government proved at trial that Joseph assaulted Richardson with a dangerous weapon, nor does Joseph contend otherwise. Here, as in *Miller,* there is no Fifth Amendment bar to conviction of an offense actually alleged in the indictment—

ecutor could *have* shown such intent as *to* Richardson had he chosen to do so.

assault with a dangerous weapon [12]—and proved at trial.

We note, finally and with regret, that the error in this case, although harmless, could have been avoided entirely if the person or persons who drafted the indictment had been more careful in doing so. If the first count had stated explicitly that Joseph had assaulted Richardson with the intent to kill Dickey, this case would have presented no constitutional issue. Instead, because of someone's haste or inattention at the drafting stage, the government ran the risk of our reversing the conviction of a man who inflicted a grave injury on a bystander who had no apparent connection with the quarrel that led to the shooting. The jury's ADW verdict, though not what the government sought, turned out to be the lucky break that staved off a reversal. To the best of our recollection, we have never before seen an assault count in an indictment or information that fails to identify the victim by name. We trust that, after today, we shall never see another.

### III

About three months after trial, but before sentencing (which had been twice postponed at Joseph's request), Joseph filed a *pro se* motion for a new trial.[13] In it Joseph claimed that his trial counsel had been ineffective for having failed to elicit allegedly exculpatory testimony from Anthony Dickey, a witness never called at trial, and Joseph Belton, a witness who was discovered during trial. He also asserted that his counsel had failed adequately to investigate and prepare the case [14] and had erred in failing to move for a bill of particulars. In addition, Joseph proffered as newly discovered evidence the affidavit of a witness, James Cuthbertson, whom he had discovered in prison. In this affidavit Cuthbertson stated that he had been across the street from the club when he saw a man wearing a red hat [15] kneeling on the sidewalk and shooting toward the front door of the club at the same time Richardson got shot. Cuthbertson did not see Joseph at that time.

At the hearing on the motion, Joseph's trial counsel, an attorney from the Public Defender Service, testified that she and Joseph had their first formal meeting on February 4, 1987, after Joseph had been released on bond. From talking to Joseph and examining the police forms, she obtained the names of Anthony Dickey, James Richardson, Pamela Swann, and Morris Yarborough. The attorney or one of her investigators interviewed Dickey, Richardson, Swann, and Richard Joseph [16] about the incident, and she herself tried to locate other persons who were in the club that night. In addition, after the trial began and counsel learned of Matthew Miller's identity through the Jencks material, she subpoenaed him and spoke with him. She also learned of Joseph Belton's identity in the course of the trial, and after the trial she sent an investigator to locate and interview him; she concluded, however, that Belton's testimony would not be sufficient to entitle Joseph to a new trial. Counsel

---

**12.** Although the indictment is not specific in identifying the person whom Joseph intended to kill, it does sufficiently "articulate the essential elements of the offense" of assault with a dangerous weapon. *Cain v. United States,* 532 A.2d 1001, 1005 (D.C.1987).

**13.** The motion was captioned as a motion for relief under D.C.Code § 23–110 (1989). That statute, however, applies only to motions to vacate sentence. Since Joseph had not yet been sentenced when he filed his motion, there was no sentence to vacate; consequently, we treat it (as the trial court did) as a motion for new trial under Super.Ct.Crim.R. 33.

**14.** In particular, Joseph claimed that his counsel did not obtain "crucial and decisive Medical Reports, specifically, Radiology Reports and Po-

lice Ballistic Reports that could have possibly identified the caliber (diameter) of the bullet still contained in the body of key government witness, Mr. James Richardson, in relation to the shells found on the street ... to the exculpation of the defendant."

**15.** This was apparently Yarborough, whom Pamela Swann described as wearing a burgundy baseball cap.

**16.** Richard Joseph, the eighty-one-year-old owner of the Baseball Club, was one of the government's witnesses at trial. He was not related to appellant John Joseph.

obtained and reviewed the medical records of everyone who had been injured in the melee at the Baseball Club, but she did not obtain x-rays of any of the victims to see if bullets were still lodged inside their bodies. Nor did she obtain any evidence relating to ballistics, since there were no bullet fragments available which a firearms expert could examine to ascertain what caliber of bullet had inflicted the injuries.

Counsel and client together developed and agreed to employ a defense theory of misidentification. Once counsel learned that the prosecutor was planning to call the people who were shot as government witnesses, she decided that the best defense strategy would be to try to undermine the government's case through cross-examination. During the trial, counsel used the Jencks material in an effort to persuade the jury that Joseph was an innocent patron of the club, cross-examined the witnesses to show that they were biased, and highlighted the fact that Mr. Richardson was not as positive of Joseph's identity as he claimed to be. She advised Joseph that it would not be a good idea for him to testify, given his prior criminal record. She did not call Dickey as a witness, both because she believed his testimony would not be helpful to Joseph and because he would probably have a Fifth Amendment privilege in light of his possession of a gun that night.

Even though there were multiple victims and the indictment charged only one assault without naming a victim, counsel did not feel the need to request a bill of particulars before trial because she and counsel for Yarborough, the co-defendant, had been told by the prosecutor that the complainant in the first count of the indictment was James Richardson. She also knew that the government would be proceeding on a theory of transferred intent, *i.e.*, that Joseph fired at Dickey, intending to kill him, but hit Richardson instead because he happened to be in the line of fire. The prosecutor had said that he was going to seek a superseding indictment and had obtained a continuance for that purpose. In hindsight

counsel acknowledged that it was "sloppy" of her "not to nail [it] down in writing" and that she should have requested a bill of particulars, but she reiterated that the prosecutor's representations had given her actual notice of the identity of the victim. She discussed with Joseph the government's allegation that he had shot several victims, including Richardson. Counsel did not believe that her defense was hampered in any way by not having requested a bill of particulars, although she was "embarrassed that [she] hadn't done it." She did not become concerned about the wording of the indictment until the judge raised the issue at trial, but she became confident during the courtroom discussions that the judge was on top of the issue and would adequately deal with it. She was satisfied that the judge's ruling about how the charge would be submitted to the jury resolved any possible double jeopardy or unanimity problems.

In support of his post-trial motion, Joseph called five witnesses, including himself. The first witness, Joseph Belton, who lived above the Baseball Club, testified that he heard the shots just as he was going to bed. He got dressed, went downstairs, and saw Joseph stumble into the club and head toward the kitchen. Before he could reach it, however, Joseph fell to the floor, where he lay "begging for help." He had been shot in the leg and, to the best of Belton's knowledge, did not have a gun on him. Belton did not know who fired the shots.

Morris Yarborough, Joseph's co-defendant who had been acquitted, testified that he saw Richardson in front of the club that night snorting cocaine and smoking "loveboat" with a woman named Mary Allen.[17] When Richardson went into the club, two men came looking for him, but Yarborough did not see where they went. He heard some gunshots but did not see anyone "doing any shooting." When Yarborough ran to hide behind some cars, he saw Dickey lying near a church and Richardson leaning against a fence.

James Cuthbertson, whom Joseph met in jail, admitted that he was selling Dilaudid

---

**17.** Allen testified as a government witness at trial.

in the neighborhood that night. From a distance of about thirty feet, he saw a man shooting in the direction of the club, and then saw another man jerk and fall across a fence about seventy feet away. He did not hear any shots coming from inside the club, but he did hear more than one gun fired. Then the man he had seen firing the gun, who was wearing a baseball cap, picked something up out of a tree box and started back across the street. Cuthbertson did not tell the police what he saw and heard because he had drugs in his possession at the time and did not want to get involved.

Joseph Wright, a close friend of appellant Joseph, was also selling Dilaudid on the street. When he heard some shots, he hid behind a car and saw a man with a red cap walking across the street towards the club, shooting and waving a pistol. Another man, who appeared to be injured, was leaning on a fence. During this time Wright was at least 300 feet away from the man with the gun. He knew that Joseph had been charged with the shooting, but he did not go to the police and said nothing until Joseph approached him in jail about testifying.

Joseph testified that his attorney did not review any reports or documents with him until after he had been found guilty. He said he was puzzled about the indictment because it did not bear the name of the person whom he assaulted; however, his counsel told him not to worry about it because the government was going to seek a superseding indictment. Joseph did not know any of the witnesses and was not familiar with the neighborhood, but he suggested to counsel that she call Dickey to testify even though he did not know whether Dickey would be a good witness for his case. Counsel suggested to Joseph that they proceed on a misidentification theory, but she did not discuss with him any of the evidence to be presented at the trial. Joseph wanted to obtain a ballistics report from an expert regarding Richardson's injuries. He also wanted to testify at trial, but he never discussed the contents of his anticipated testimony with his attorney.

In rejecting Joseph's claim of ineffective assistance of counsel, the court found that the performance of Joseph's trial attorney more than adequately satisfied the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, with respect to Joseph's assertion that counsel failed to present "available exculpatory testimony" from Dickey that Joseph "did not shoot Mr. Dickey or anyone else in the club," the court noted that no evidence had ever been presented, either by testimony at the hearing or by affidavit, to show that Dickey would have so testified. Counsel, the court said, had no reason to believe that Dickey would exonerate Joseph and correctly recognized that Dickey, who had been carrying a gun that evening, might well have had a valid Fifth Amendment privilege against self-incrimination. In addition, she knew that if Dickey had testified, the prosecutor would have impeached him with his Jencks statement on cross-examination.

Regarding counsel's failure to call Joseph Belton after learning of his identity during the trial, the court concluded that Belton's post-trial testimony was not helpful to Joseph and that counsel's failure to call him therefore did not prejudice the defense. Belton was not an eyewitness to the exchange of gunfire and did not even have his glasses on when he first went downstairs to see what the shooting was all about. At most, the court found, his testimony would have been cumulative of that of the proprietor of the club, Richard Joseph.

As for Joseph's assertion that counsel failed to investigate the case adequately, the court found that this assertion was contradicted not only by counsel's testimony at the hearing but by that of Joseph himself. Counsel met with Joseph several times to discuss the case, sent investigators to visit the scene, located and interviewed witnesses, reviewed all the important documents, developed a sound defense strategy, and showed good judgment in not following up on ballistics reports and in advising Joseph not to testify.

Finally, the court held that counsel's failure to request a bill of particulars did not amount to ineffective assistance. Joseph was not prejudiced because, despite the vagueness of the charging language in the indictment, both he and his counsel had received actual notice—both during discovery and at trial—that the government's case would be based only upon the assault on Richardson. Joseph was thus "apprised of the nature of the allegations against him with the requisite degree of constitutional particularity to prepare his defense and to plead a bar of double jeopardy to any subsequent prosecution relating to his use of a weapon inside the [Baseball] Club on the date in question."

As to the remainder of Joseph's motion, the court ruled that none of the newly discovered evidence warranted a new trial. Yarborough's version of the events was not corroborated by any other witness, nor was Yarborough able to see whether anyone fired from inside the club. Cuthbertson also was not in a position to see Joseph during the shooting. Moreover, the inconsistencies between his testimony at the hearing and his affidavit, as well as his friendship with Joseph, made it difficult for the court to credit his testimony; "but even if I did," the court said, "that [testimony] in no way would affect the verdict in this case."

The court also found Wright's testimony incredible. In particular, it questioned why Wright, a very close friend of Joseph, would have taken so long to come forward if in fact he had seen what he claimed he saw. In addition, his version of events was inconsistent with those of Yarborough and Cuthbertson. In sum, the court found that the testimony of these three witnesses could not have affected the verdict because none of them elucidated the critical issue: whether or not Joseph fired at Richardson from inside the club.

## IV

Claims of ineffective assistance of counsel must be evaluated under the standards set forth by the Supreme Court in *Strickland v. Washington, supra,* which this

court adopted in *White v. United States,* 484 A.2d 553, 558 (D.C.1984). The *Strickland* test has two components:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland, supra,* 466 U.S. at 687, 104 S.Ct. at 2064. The Court went on to define "the appropriate test for prejudice":

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694, 104 S.Ct. at 2068. There is, moreover, "a strong presumption," which the defendant must overcome, "that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.* at 689, 104 S.Ct. at 2065. In this case, while it is true that defense counsel did not move for a bill of particulars and did not offer the testimony of Mr. Belton, we agree with the trial court that neither omission, analyzed under *Strickland,* warrants reversal of Joseph's conviction.

 The purpose of a bill of particulars is to inform the defendant of the specifics of a charge so that he or she may prepare a proper defense and avoid surprise. *Davis v. United States,* 315 A.2d 157, 161 (D.C.1974). That purpose was achieved in this case, even though there was no actual bill of particulars. Defense counsel had consulted before trial with the prosecutor, who assured her that the government intended to try Joseph only for the assault on Richardson. While counsel herself admitted that it would have been better to "nail down" such an arrangement in writing, her testimony was emphatic

that the lack of a bill of particulars in no way compromised the defense of her client. Furthermore, the evidence at trial and the jury instructions made clear that Joseph was tried only for the assault on Richardson, despite the failure of the indictment to identify a victim by name. Since the lack of a bill of particulars in no way prejudiced Joseph's defense, we agree with the trial court that counsel's failure to move for one falls far short of ineffective assistance.

■ Likewise, the failure to call Mr. Belton as a witness at trial did not rise to the level of a Sixth Amendment violation. As the trial court found, Belton's testimony would not have provided any new evidence helpful to appellant. He was not an eyewitness to any of the shootings, and when he did arrive on the scene, he did not have his glasses with him. Furthermore, the testimony he presumably would have given, that he did not see Joseph with a gun when he came downstairs, was cumulative of similar testimony given by Richard Joseph, which counsel knew from reviewing the Jencks material. There is no support here for Joseph's claim of ineffective assistance.

■ Finally, Joseph's claim of newly discovered evidence was based on the proffered testimony of Yarborough, Cuthberson, and Wright, each of whom was allegedly "discovered" either at the end of the trial or after trial. The five-part standard for assessing such claims has been settled in this jurisdiction for over forty years:

> To obtain a new trial because of newly discovered evidence (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5)

of such nature that in a new trial it would probably produce an acquittal.

*Thompson v. United States*, 88 U.S.App. D.C. 235, 236, 188 F.2d 652, 653 (1951) (citations omitted), adopted in *Heard v. United States*, 245 A.2d 125, 126 (D.C.1968); *accord, e.g., Smith v. United States*, 466 A.2d 429, 432–433 (D.C.1983). The trial court, without considering the first, second, and fourth elements of the test, ruled that the proffered evidence did not meet the third and fifth elements. We find no error in that ruling.

Yarborough's testimony was, at best, cumulative of that given at trial by Matthew Miller, a government witness.[18] Yarborough was some distance outside the club and could not see anyone shooting from within; he could not offer any evidence to show that Joseph had not done the shooting.[19] Cuthbertson's and Wright's testimony fails the *Thompson* test for similar reasons. Neither was in a position to see whether Joseph fired at Richardson from inside the club, and thus the evidence added nothing to what the jury heard. Moreover, the trial court was within its discretion in questioning the credibility of both Cuthbertson and Wright because of their close friendship with Joseph and the belated nature of their testimony. The government's evidence at trial was strong and persuasive. On the record before us, we can find no abuse of discretion by the trial court in its rejection of Joseph's newly discovered evidence. *Smith v. United States, supra*, 466 A.2d at 432.

### V

For the foregoing reasons, the judgment of conviction is

*Affirmed.*

---

18. Miller, who was driving past the Baseball Club on the way to work when the shootings occurred, testified that he saw a man in a red baseball cap standing on the sidewalk, shooting in the direction of the club. Miller did not see any shots coming from inside the club, but he had "an idea" that shots were being fired from inside.

19. The trial court noted that Yarborough's statement that two men came looking for Richardson, implying that they were responsible for the shooting, was inconsistent with the remaining evidence and was uncorroborated by the testimony of any other witness.