613 A.2d 1381 (1992)
Oliver W. JOHNSON, Appellant,
v.
UNITED STATES, Appellee.
No. 89-CF-554.
District of Columbia Court of Appeals.
Argued March 2, 1992.
Decided August 18, 1992.
*1382 Daniel E. Ellenbogen, Washington, D.C., appointed by this court, for appellant.
Douglas K. Klein, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Thomas C. Black, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.
Before ROGERS, Chief Judge, and STEADMAN, Associate Judge, and GALLAGHER, Senior Judge.
ROGERS, Chief Judge:
Appellant Oliver Johnson was convicted by a jury of seventeen counts of forgery and seventeen counts of uttering forged checks, D.C.Code §§ 22-3801 and -3842(c) (1989 Repl.), and one count of first degree theft, id. §§ 22-3801 and -3812(a) (1989 Repl.).[1] On appeal he contends principally that there was a constructive amendment of the indictment counts charging forgery, and that he was deprived of his right to a fair trial because repeated references to his exercise of his right to remain silent. We agree that because the indictment was constructively amended, appellant's forgery convictions must be reversed, but otherwise find appellant's contentions unpersuasive.

I
In April, 1982, appellant Oliver Johnson was elected president of the American Federation of Government Employees (AFGE) Local 1000, a union which represented non-management employees of the Department of Employment Services in the District of Columbia. The union consisted of an elected executive board of officers and non-management employees such as clerks and secretaries. The union followed the general fiscal policy set forth in the AFGE Local Officers' Manual, including a general rule that the union membership must approve all union expenditures. The only exception to this rule empowered the executive board to make its own decisions on discretionary funds up to a total of $250 per month. The executive board adopted a policy that the union not make any checks out to "cash." All checks written on the union's account required two signatures, those of the president and the treasurer of the union. In the event that either of those officers was unavailable to sign a check, an unwritten union policy permitted the executive vice-president to sign in the place of whoever was unavailable. The union also had a *1383 policy which required executive board members who wished to be reimbursed for out-of-pocket expenses related to the union to provide a receipt of their expenditure to the treasurer.
Early in 1984 Fred Zackary, a union member, began to question appellant's leadership of the union[2] and his fiscal responsibility, particularly the fact that appellant's verbal financial reports did not correspond with the union's written reports. As a result, Zackary made a written request that appellant provide him with copies of the March and April, 1984 financial reports. When appellant failed to produce them, Zackary contacted the union's national vice-president, Don McIntyre, about his concerns.
In December 1986, the union met to discuss the allegations that appellant had been fiscally irresponsible, and it authorized a committee to conduct an audit of the union's financial records. Over the objections of appellant, the audit committee requested the union's cancelled checks from the bank. Upon examining the checks, the audit committee noticed that some of the signatures on checks written in 1984, specifically those of Rufus Norris, did not look like Mr. Norris' regular signature. In addition, some of the 1984 checks written and endorsed by appellant were made out to "cash."
Angela Satterthwaite, a union vice-president and member of the audit committee, reported her suspicions that Mr. Norris' signature[3] on the 1984 checks had been forged to Mr. McIntyre of the national union office. In May 1987, after discussions with Mr. McIntyre, Ms. Satterthwaite reported her suspicions to the U.S. Attorney's office. In July 1987, Detective Sally Kirk of the Metropolitan Police Force interviewed appellant in her office about the checks for "cash" that contained his and Norris' signatures. After advising him "briefly what the nature of the investigation was," appellant admitted during the interview that he had written, signed his signature, endorsed and cashed the checks, and stated that the checks had also been signed by Rufus Norris.[4] Detective Kirk told appellant that Rufus Norris had denied signing the checks.
James Brown, a Metropolitan Police Department handwriting expert, testified that he had compared handwriting exemplars provided by appellant, Mark Harris and Rufus Norris to the handwriting on the seventeen checks. In his expert opinion, neither Mark Harris nor Rufus Norris had signed any of the checks in question. Mr. Brown also testified that, to a scientific certainty, appellant had not written the signatures of Harris or Norris. Appellant did not present any evidence.

II
The indictment charging appellant with forgery of seventeen checks made payable to cash stated that:
On or about, within the District of Columbia, Oliver W. Johnson, with intent to defraud, falsely made and altered the signature on a bank check.
Appellant contends that there was a constructive amendment of the indictment because the forgery counts in the indictment stated that he "falsely made and altered the signature on [17] bank check[s]," while the government's proof at trial was that appellant did not write the second signature on the checks, but that it had been made by a second, unnamed person, and the jury may have convicted him for his unauthorized completion of other portions *1384 of the checks.[5]
The Grand Jury Clause of the Fifth Amendment states that: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." An indictment, as a charging instrument, offers three protections to the accused: it must inform the accused of the charges against him so that he may adequately prepare his defense, it must describe the crime with sufficient specificity to protect the accused against future prosecution for the same offense,[6] and it "protect[s] against oppressive actions of the prosecutor or a court, which may alter the charge to fit the proof."[7] The Constitution guarantees the right to be tried only on charges made by the indictment, and thus ensures that a defendant will not be convicted on the basis of facts not found by, or presented to, the grand jury which indicted him. See Russell v. United States, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962).
Heretofore the court has summarized the law by stating that "[t]he law recognizes two types of departures from the original indictment:
An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them. A variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment.
(Terrence) Ingram v. United States, 592 A.2d 992, 1005 (D.C.1991) (quoting Scutchings, supra note 7, 509 A.2d at 636) (emphasis in original); see Gaither, supra note 7, 134 U.S.App.D.C. at 164, 413 F.2d at 1071. Because an amendment infringes on the constitutional right to grand jury indictment, the Supreme Court has adopted a per se reversal rule. Ex parte Bain, 121 U.S. 1, 7, 7 S.Ct. 781, 784, 30 L.Ed. 849 (1887); see (Terrence) Ingram, supra, 592 A.2d at 1005; Scutchings, supra note 7, 509 A.2d at 637.
Generally described, a constructive amendment occurs when the trial court permits the jury to consider, under the indictment, "an element of the charge that differs from the specific words of the indictment." (Terrence) Ingram, supra, 592 A.2d at 1005; see Stirone v. United States, 361 U.S. 212, 217-218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960) (indictment limited to extortion by interference with interstate transportation of sand expanded by constructive amendment to include interference with sand and steel.) "A variance becomes a constructive amendment ... when `facts introduced at trial go to an essential element of the offense charged, and the facts are different from the facts that would support the offense charged in the indictment.'" Scutchings, supra note 7, 509 A.2d at 637 (quoting Giles v. United States, 472 A.2d 881, 883 (D.C.1984)) (emphasis in original).
In contrast to an amendment, a variance occurs when the facts proved at trial "materially differ from the facts contained *1385 in the indictment `but the essential elements of the offense are the same.'" (Terrence) Ingram, supra, 592 A.2d at 1006 (quoting United States v. Keller, 916 F.2d 628, 634 (11th Cir.1990)); see United States v. Miller, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) (variance where indictment charged defrauding insurer both by consenting to the burglary in advance and by lying to the insurer about the value of the loss, and proof at trial concerned only the latter charge). Thus, while the Supreme Court held that there was a constructive amendment in Stirone, supra, 361 U.S. at 213, 80 S.Ct. at 271, because the trial evidence broadened the possible bases for conviction from that charged in the indictment, the Court found only a variance in Miller, supra, 471 U.S. at 131, 105 S.Ct. at 1812, since the conviction was based on trial proof that supported a significantly narrower and more limited basis for conviction than that charged in the indictment. A variance between the indictment and the government's proof at trial implicates notice and double jeopardy guarantees and requires reversal only upon a showing of prejudice. Scutchings, supra note 7, 509 A.2d at 637; Kotteakos v. United States, 328 U.S. 750, 757, 766, 66 S.Ct. 1239, 1244, 1248-49, 90 L.Ed. 1557 (1946); Berger v. United States, 295 U.S. 78, 82, 84, 55 S.Ct. 629, 630-31, 631-32, 79 L.Ed. 1314 (1935).
The distinction between the two terms is not always precise, however, and to evaluate whether an indictment has been constructively amended, the court must compare the evidence and the instructions to the jury with the charge specified in the indictment. See Scutchings, supra note 7, 509 A.2d at 638 (conviction reversed where indictment charged "threats and force" while evidence and jury instructions presented "bribery, threats and force"). Where, as here, there is a difference between the charging terms in the indictment and the evidence and instructions at trial, a case-by-case analysis is required. See (Redell) Ingram v. United States, 392 A.2d 505 (D.C.1978). Because we hold that there was a constructive amendment of the indictment, we need not reach the issue of prejudice.
The government's handwriting expert opined, to a scientific certainty, that appellant did not write the forged signature on the checks.[8] Indeed, in commenting on the expert's testimony, the trial judge noted that "the only inference that the jury can reasonably draw from the expert's testimony is that neither Mr. Norris, Mr. Harris, nor Mr. Johnson applied the Norris or Harris signatures." Instead, the government's evidence showed, through appellant's admissions, that appellant wrote everything on the checks except the signatures of Norris and Harris.
In the opening statement, the government presented a theory of the case that the second signature on the checks was forged, that both Norris and Harris claimed that they had not signed the checks, that it was the expert opinion that of a handwriting analyst that "for the most part, the check[s were] made out by [appellant]," and therefore that appellant had made the checks out without authorization of the second signator. In closing argument the government returned to this theory and to the theory set forth in the instructions that the judge had already given to the jury, see Super.Ct.Crim.R. 30, that forgery could be proved if appellant had written parts of the checks other than the second signature without authorization.[9] *1386 The government's proof at trial attempted to suggest that appellant had signed the second signature until its expert's testimony eliminated that premise of guilt, whereupon the prosecutor emphasized a theory that the evidence indicated there was a false making by a third person of the second signature and appellant knew that the second signature was false and compounded the forgery by inserting the unauthorized language on the check. Yet the counts of the grand jury indictment charging forgery stated that appellant "falsely made and altered the signature on a bank check." The trial judge instructed the jury that "the government must prove beyond a reasonable doubt that the defendant falsely made, altered, signed or endorsed the written instrument," and that "[i]t [was] not necessary that [the government prove] that the whole instrument ha[d] been falsified or altered, only that it contained some material misrepresentations of fact."[10]
Although the instant case does not involve a striking of words from the indictment by the trial judge, the effect was the same since the instructions allowed the jury to convict appellant of forgery even if it did not find that he forgery the second signatures on the checks. That this is an impermissible amendment is clear from Ex Parte Bain, supra, 121 U.S. 1, 7 S.Ct. 781. There the trial judge, on motion by the United States, struck from the single count of the indictment charging bank directors with making false entries the words "the comptroller of the currency and" where the indictment charged that false statements in a report by the banking association to the comptroller were made with intent to defraud certain parties "with intent to deceive the comptroller of the currency and the agent appointed to examine the affairs of said association...." 121 U.S. at 4, 7 S.Ct. at 783. Addressing the view of the trial judge that he had done no more than *1387 to strike as "surplusage" from the indictment non-material words that did no harm to the defendant, 121 U.S. at 10, 7 S.Ct. at 786, the Supreme Court rejected the view that the trial court may say whether or not the grand jury would have returned the indictment without reference to the comptroller.[11] Furthermore, by allowing the jury to convict the defendant for acts not charged by the grand jury, the court expanded the charge in the indictment. See Stirone, supra, 361 U.S. at 216, 80 S.Ct. at 272-73; Wright, supra note 8, 564 A.2d at 737 (indicted as principal; convicted as aider and abettor); see also Joseph v. United States, 597 A.2d 14, 17 (D.C.1991) (citing Scutchings, supra note 7, 509 A.2d at 638, as holding that essential elements of offense include means of commission and identity of party involved).
Because the indictment specified a particular means of forgerya falsely made signaturewhile the evidence and jury instructions addressed a different means of culpabilitywriting any part of the checks without true signator's authoritythe government and trial court gave the jury the opportunity to convict appellant regardless of whether he signed or procured the second signature. Thus, there was a constructive amendment of the forgery charges in the indictment.[12]See (Terrence) Ingram, supra, 592 A.2d at 1006 (constructive amendment of indictment where indictment has a particular theory but the evidence and instructions address a different theory).[13] Such an amendment is per se reversible error, and appellant's forgery convictions must therefore be reversed. See Stirone, supra, 361 U.S. at 217, 80 S.Ct. at *1388 273, Scutchings, supra note 7, 509 A.2d at 638; Giles, supra, 472 A.2d at 883.

III
The counts of the indictment charging appellant with first degree theft, D.C.Code §§ 22-3811, -3812(a), stated:
Between on or about January 13, 1984, and on or about April 24, 1984, within the District of Columbia, Oliver W. Johnson wrongfully obtained and used property of a value of $250 or more, belonging to the American Federation of Government Employees, Local 1000, consisting of money, with the intent to appropriate the property for his own use and to deprive the American Federation of Government Employees, Local 1000 of a right to and benefit of the property.[14] [Emphasis added]
Appellant does not dispute that the government met its burden of proof to show that he cashed the checks and had possession of the money thereafter. Rather, he contends that that government failed to prove that he appropriated the funds for his own use.
The government disagrees, relying on the evidence of (1) appellant's admission to Detective Kirk that he made, signed, and endorsed the checks, (2) the testimony of Mr. Norris and Mr. Harris that they neither signed nor authorized appellant to use their signatures; they also testified that appellant never asked them for authorization to cash the checks; (3) the union policy on "cash" checks and use of discretionary funds totalling over $250 a month without a vote of the union membership and appellant's writing and cashing seventeen checks totalling almost $4,000 in a relatively short period of time, and (4) appellant's resistance, indicative of his intent to evade discovery and to use union funds for his own benefit, to union efforts to obtain the financial records in his possession and the cancelled checks from the bank. From this evidence the government maintains that a reasonable jury could infer that appellant wrongfully obtained union funds for his own benefit by making and cashing checks against union policy and without union authorization. Moreover, the government maintains that since no one in the union had knowledge of the checks and appellant did not produce receipts for union expenses to justify the checks, a reasonable jury could infer that appellant did not use the funds for union activities.
Viewing the evidence, as we must, in the light most favorable to the government, see Robinson v. United States, 506 A.2d 572, 573 (D.C.1986); McClain v. United States, 460 A.2d 562, 567 (D.C.1983) we agree. See Fox v. United States, 421 A.2d 9, 13 (D.C.1980) (government not required to disprove every possible inference of innocence).[15]

IV
Finally, appellant contends that he was deprived of a fair trial by the government's repeated comments on his exercise of his right to remain silent during a pre-arrest interview with a police detective. In the opening statement to the jury, the prosecutor stated that:
... the defendant who was now under investigation by other Board members, was asked to talk to a member of the Check and Fraud Division, Detective Sally Kirk, and Sally Kirk talked to the defendant, Oliver Johnson, and said here are some checks with respect to the first nine checks that were discovered. Is this your signature? Oliver Johnson said yes. Did you cash those checks? He *1389 said yes. Oliver Johnson said I have receipts for those.
Ladies and gentlemen, Detective Sally Kirk said to him, the second signature is not Rufus Norris' signature. He said it is not his signature. What do you have to say about that? Oliver Johnson said nothing.
In response to a defense objection, the trial judge instructed the jury that it was not to draw any adverse inference from the fact that appellant did not respond to a question posed by a police officer.[16]
Later, the government offered the testimony of Detective Kirk. Over the objections of defense counsel, the trial judge allowed the government to elicit from Detective Kirk the fact that she had advised appellant that Mr. Norris had denied signing the checks. The judge prohibited the government from taking the line of questioning any further.[17]
In closing argument to the jury, the prosecutor stated:
And then there's an interview with Oliver Johnson. And what does Oliver Johnson say to Detective Kirk? ... He says, "Yeah, I cashed them. Yes, I made out the face of the checks"any information on that check, ladies and gentlemen, which is unauthorized"I made out the face of the check, I signed it and endorsed it."
Appellant contends that this evidence even presented in a partially sanitized mannerwas inadmissible because it tended to create an adverse inference regarding appellant's silence in the face of an implied accusation.
The Supreme Court has not yet addressed, the government states in its brief, the precise question of whether the prosecution's reference to pre-Miranda silence in its case-in-chief violates the Fifth Amendment. See Fencl v. Abrahamson, 841 F.2d 760, 766 (7th Cir.1988) (noting that, except for the 10th Circuit, the federal circuit courts of appeal have declined to decide the issue, and declining to do so itself where the defendant had not testified, using instead a harmless error analysis). Under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it is impermissible to penalize a defendant for exercising his Fifth Amendment privilege against self-incrimination while he is under police custodial interrogation. Id. 384 U.S. at 468, 86 S.Ct. at 1624. If a defendant remains silent in the face of accusation while he is under arrest, the prosecution cannot use his silence against him at trial. Id. Nor may the government impeach a defendant with his post-arrest, post-Miranda advice silence to show inconsistency with an exculpatory story told at trial. See Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In Fletcher v. Weir, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam), however, the Court held that due process is not violated when a state permits cross-examination of a defendant as to post-arrest, pre-Miranda advice silence to impeach a defendant who chooses to take the stand. Id. 455 U.S. at 607, 102 S.Ct. at 1312. The Court has also held that impeachment of a defendant by reference to his pre-arrest, pre-Miranda advice silence does not violate his constitutional rights. Jenkins v. Anderson, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980).
*1390 The Tenth Circuit Court of Appeals has concluded that comment on a defendant's silence during a civil investigation was not error where the defendant did not remain silent in reliance on government action, i.e., a Miranda warning. United States v. Harrold, 796 F.2d 1275, 1279 (10th Cir. 1986), cert. denied, 479 U.S. 1037, 107 S.Ct. 892, 93 L.Ed.2d 844 (1987) (assertion of Fifth Amendment privilege against self-incrimination during preindictment, pre Miranda warnings, interview by IRS agents).[18] The Eight Circuit Court of Appeals has adopted a similar analysis. See United States v. Rederth, 872 F.2d 255, 257-58 (8th Cir.1989) (detective's testimony on redirect about the defendant's termination of interview prior to arrest and Miranda warnings not improper use of defendant's silence; the trial judge had sustained a defense objection during the detective's direct examination and on cross examination defense counsel brought out that the defendant had not been given Miranda warnings). On the other hand, the Second Circuit Court of Appeals noted that "all of the cases permitting proof of silence, including Jenkins, have involved impeachment or rebuttal of the defendant's testimony," and stated that "we are not confident that Jenkins permits even evidence that a suspect remained silent before he was arrested or taken into custody to be used in the Government's case in chief." United States v. Caro, 637 F.2d 869, 876 (2d Cir.1981). In that case, the Second Circuit assumed error and found it to be harmless beyond a reasonable doubt. Id. at 876.
We find ourselves in much the same position as the Second Circuit Court of Appeals in view of the state of the current law. We too need not decide the issue because, assuming that it was error to admit the evidence of appellant's silence in response to the detective's question whether he knew that Norris had denied signing the checks, we are satisfied that any error was harmless beyond a reasonable doubt. See Rose v. Clark, 478 U.S. 570, 577, 106 S.Ct. 3101, 3105, 92 L.Ed.2d 460 (1986), citing Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1981). The only reference to appellant's refusal to respond was during the prosecutor's opening statement to the jury. The judge instructed the jury at that time that no inference whatever could be drawn from appellant's refusal to respond to the detective's question. The detective's testimony at trial was confined so that no mention was made of appellant's reaction to the detective's statement that Norris denied that the signatures on the checks were his. In closing argument the prosecutor did not refer to appellant's refusal to respond. Under these circumstances, in view of the strength of the government's case against appellant, we are satisfied that no reversible error occurred.
Accordingly, we reverse the judgments of conviction of forgery and otherwise affirm.
NOTES
[1] Appellant was sentenced to one to three years on each forgery count to run consecutively with each other; one to three years on each uttering count to run consecutively with each other but concurrently with each forgery count; and three to nine years for theft, to run consecutively to the forgery and uttering counts. The judge suspended all but one year of the sentence and placed appellant on five years probation, to begin upon appellant's release from prison.
[2] Appellant was re-elected president of the union in March, 1984.
[3] Three of the checks, dated January 13, 20 and 25, 1984, bore forged signatures purporting to be those of Mark Harris, a former executive vice-president of the local who had resigned his office in November, 1983. Mr. Harris told police that the signatures at the bottom of the checks were not his, and that he had never authorized appellant to use or place his signature on the checks.
[4] According to Detective Kirk, appellant told her that he had used the money for various things and had receipts in his office but that someone had stolen the receipts.
[5] Appellant contends that the alteration of the signatures which is alleged in the forgery counts is "incorporated by reference into the uttering count." According to appellant, the "forged signature constituted the same basis for alleging the item passed was forged when it was cashed at the bank ... [and] the falsely made signature is thus the critical element of the forgery underlying both the forgery and uttering counts." [id.] The uttering counts of the indictment charged that appellant, "with intent to defraud, transferred, published, delivered or presented to [someone], as true and genuine, ... falsely made and altered bank check[s]." Contrary to appellant's assertion, the uttering counts did not charge "by reference" forgery of a signature, but only the passing of a "falsely made or altered bank check." Thus, appellant's contention that the indictment on the uttering counts varied from the government's proof at trial is meritless.
[6] Scutchings v. United States, 509 A.2d 634, 636 (D.C.1986); Gaither v. United States, 134 U.S.App.D.C. 154, 159, 413 F.2d 1061, 1071 (1969); United States v. Miller, 471 U.S. 130, 135, 105 S.Ct. 1811, 1814, 85 L.Ed.2d 99 (1985).
[7] Wright v. United States, 564 A.2d 734, 737 (D.C.1989); Scutchings, supra note 7, 509 A.2d at 636; Gaither, supra note 7, 134 U.S.App.D.C. at 159, 413 F.2d at 1061.
[8] Apparently, the prosecutor had not anticipated this testimony from its expert, Mr. Brown. When the prosecutor attempted to obtain a continuance to allow another handwriting expert to examine the exemplars, the trial judge refused to permit it.
[9] In closing argument, the prosecutor told the jury that:

the Government has nothas not alleged that [appellant] wrote the name of Ms. Norris from Mark Harris. We have not alleged that. But that doesn't change the fact that Rufus Norris didn't write Rufus Norris' name. It was a forgery. Mark Harris didn't write Mark Harris' name. It was a forgery.
[Appellant] knew it wasn't Rufus Norris' name. [Appellant] knew it wasn't Mark Norris' name. Appellant wrote out the rest of the check, Any information, the instructions will tell you, the rest of the check, cash, numbers, signature and endorsement, that is forgery under the Court's instructions.
You need not have written Rufus Norris' signature. Indeed, the fact that a second person may have helped him, does not make him innocent, ladies and gentlemen. And that is what the instruction speaks to:
A defense objection was overruled. Later in her closing argument, the prosecutor called the jury's attention to "the similarities between [appellant's] signature and Rufus Norris' signature," and to the fact that the jury could compare the handwriting samples.
Defense counsel, in turn, argued to the jury that there was no evidence, and the jury could not speculate, about where the second signature came from or who wrote that signature. Defense counsel focused on the expert's testimony that appellant did not sign the second signature. Defense counsel emphasized that proof about where the second signature came from was crucial to convict appellant of the forgery charged.
In rebuttal closing argument, the prosecutor noted that defense counsel had "made this big deal about this second signature, Rufus Norris', whether or not [appellant] wrote it or not," and told the jury that it could make its own determination irrespective of the expert's testimony. The prosecutor asked the jury to compare the writing samples and "[l]ook at the "E"s and the "U"s and the endings." She argued that the evidence "leads you to believe that there is one person who knows who wrote the second signature and that is all that counts. * * * So whether or not [appellant] wrote that [second signature] or directed it or just knew makes no difference. And that's why the law is structured where it says, any informationany information on that check written by [appellant], the cash, the numbers, and the endorsement, because it doesn't matter if he directed it or he did it himself, the rest of it, because he knew it and that shows it...."
[10] Before closing arguments by counsel, the judge instructed the jury that to establish the first element of forgery:

the government must prove beyond a reasonable doubt that the defendant falsely made, altered, signed, or endorsed the written instrument. It is not necessary that the whole instrument have been falsified or altered, only that it have contained some material misrepresentation of fact. Absent the true second signator's authority, the insertion of the defendant of any information into a check is a false making or altering of the document.
Defense counsel made clear, during discussion of the proposed instructions on forgery, that "[t]he essential component that's been at issue throughout this whole trial is the signatures," and objected to allowing the government an opportunity to expand its theory to include that appellant falsely made, altered or endorsed the checks. He also made his position clear during his motion for judgment of acquittal at the close of the government's case in chief. After closing arguments were completed and the trial judge gave the remaining instructions to the jury, defense counsel renewed his motion for a mistrial, including as grounds the government's aiding and abetting argument in the absence of a request by the government for the jury to be instructed on aiding and abetting. The judge denied the motion.
[11] The Court stated:

While it may seem to the [trial] court, with its better instructed mind in regard to what the statute requires to be found as to the intent to deceive, that it was neither necessary nor reasonable that the grand jury should attach importance to the fact that it was the comptroller who was to be deceived, yet it is not impossible nor very improbable that the grand jury looked mainly to that officer as the party whom the prisoner intended to deceive by a report which was made upon his requisition and returned directly to him. * * * * How can the court say that there may not have been more than one of the jurors who found this indictment who was satisfied that the false report was made to deceive the comptroller, but was not convinced that it was made to deceive anybody else?
121 U.S. at 10, 7 S.Ct. at 786. See also Miller, supra, 471 U.S. 130, 105 S.Ct. 1811 (narrowing of indictment does not constitute constructive amendment).
[12] The government contends that the difference between the terms of the indictment and the proof at trial does not amount to a constructive amendment because "[i]t is well settled that if an indictment charges an individual as a principal, but the accused is convicted as an aider and abettor, there is not a constructive amendment or variance of the indictment." (Terrence) Ingram, supra, 592 A.2d at 1006. This argument would undoubtedly be more persuasive had the government asked the trial judge to instruct the jury on aiding and abetting. It did not do so, and the judge did not so instruct the jury. See (Terrence) Ingram, supra, 592 A.2d at 1006 (trial court must instruct that guilt may be premised on the defendant acting as either an aider and abettor or as a principal) citing Barker [v. United States], supra, 373 A.2d at [1215] 1219 (court "not persuaded that the proof presented ... and the trial court's instructions in its charge [on aiding and abetting] raised the `substantial likelihood' that [the defendant] may have been convicted of a crime different from that charged by the grand jury so as to constitute a constructive amendment to the indictment. In our view the prosecution was not attempting to prove a different offense than was charged in the indictment..."). Therefore, the government cannot now argue that appellant has been convicted as an aider and abettor, and not as a principal, in falsely making the signature on the checks. Cf. Wright, supra, 564 A.2d at 737 (conviction as aider and abettor where indictment charges defendant as principal is an expansion of charges in indictment where grand jury heard evidence of two separate acts but charged only one crime of rape).
[13] Jackson v. United States, 123 U.S.App.D.C. 276, 359 F.2d 260, cert. denied, 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966), viewing the specification in the indictment of a taking by force and violence "against resistance" as surplusage since no proof of "against resistance" was required for conviction under the statute, is not to the contrary. The result in that case turned on the court's view that there was a single set of facts underlying the pickpocket charge of obtaining the complainant's property on a date by force and violence. Id. at 279, 359 F.2d at 263. The court left open the question "whether Stirone would govern if timely objection had been made," observing, however, that "the variance is less substantial in factual degree than the one involved in Stirone." Id., 359 F.2d at 263. See Scutchings, supra note 7, 509 A.2d at 639 (distinguishing Jackson).
[14] D.C.Code § 22-3811 (1989 Repl.) provides that the offense of theft is committed if a "person wrongfully obtains or uses the property of another with intent (1) To deprive the other of a right to the property or a benefit of the property; or (2) To appropriate the property to his or her own use or to the use of a third person."
[15] Appellant's contention that there was insufficient evidence of uttering is meritless. D.C.Code § 22-3842(c). In view of our disposition of the forgery counts, see Part II, supra, we need not address his merger claim, which in any event is meritless. See White v. United States, 613 A.2d 869 (D.C. July 28, 1992); Monroe v. United States, 600 A.2d 98 (D.C.1991) (per curiam); Byrd v. United States, 598 A.2d 386 (D.C.1991) (en banc).
[16] The trial judge told the jury:

Ladies and gentlemen, the fact that a person offers no response to a question provided by a law enforcement officer is not the same as an admission. It is not an incriminating act. The person is perfectly within their rights not to respond to a police officer's inquiry even if the question is a subject of investigation. That is why the objection was sounded. That was part of the factual description that is being offered by the Government that is something that occurred. But you may not draw any inference whatsoever to the fact that the defendant did not respond to the question by a law enforcement official.
[17] The trial judge allowed the following exchange between the prosecutor and Detective Kirk:

[THE PROSECUTOR]: Specifically, Detective Kirk, did you tell [appellant] that the signatures that Rufus Norris had indicated that those signatures on the bottom of the check were not his?
THE WITNESS: Yes, I did. I said
THE COURT: You have answered the question.
[18] The opinion shows, however, that the defendant was advised of his Fifth Amendment rights by the IRS agents before the agents inquired about whether he had filed income tax returns in certain years. 796 F.2d at 1278-79 n. 2. The agent also testified that the defendant had "assert[ed] the Fifth Amendment to various questions I asked him after I had read him his rights." Id.