William D. BAKER (01–CF–383), Bryant C. Woodland (01–CF–392), Jamal R. Sampson (01–CF–517), Eric T. Franklin (01–CF–520), Appellants,

v.

UNITED STATES, Appellee.

Nos. 01–CF–383, 01–CF–392, 01–CF–517 and 01–CF–520.

District of Columbia Court of Appeals.

Argued Jan. 23, 2004.
Decided Feb. 10, 2005.

M. Elizabeth Kent, Washington, DC, appointed by the court, for appellant Baker.

Richard S. Stolker, Rockville, MD, appointed by the court, for appellant Woodland.

Deborah A. Persico, Washington, DC, appointed by the court, for appellant Sampson.

Corinne Beckwith, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant Franklin.

Mary B. McCord, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and M. Jeffrey Beatrice, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and WASHINGTON, Associate Judges, and STEADMAN, Senior Judge.[*]

STEADMAN, Senior Judge:

On August 5, 1999, one man was fatally shot and another man was stabbed during an early morning break-in at a house at 1303 T Street Northwest. The four appellants, William Baker, Eric Franklin, Jamal Sampson, and Bryant Woodland, who together entered the house that night while heavily armed, were tried jointly before a jury and all convicted of first-degree burglary while armed, first-degree felony murder while armed, first-degree premeditated murder while armed, assault with intent to kill while armed, aggravated assault while armed, and two counts of possession of a firearm during a crime of violence (PFCV) (one relating to the burglary and one relating to the murder).

In these consolidated appeals, appellants make eight distinct arguments, none of which requires reversal. The two major arguments are: (1) the indictment for burglary while armed was constructively amended by the trial court's instructions on intent in response to a jury note, requiring a new trial for all four appellants; and (2) Franklin, Sampson, and Woodland argue that introduction of an inculpatory statement Baker made to police violated their Confrontation Clause rights. Additional arguments are: (3) a jury instruction on co-conspirator liability was unconstitutional because there was no indicted conspiracy charge; (4) there was insufficient evidence to support convictions based on aiding and abetting or a conspiracy; (5) there was insufficient evidence of premeditation and deliberation for first-degree murder; (6) evidence that the individual who was stabbed suffered serious bodily injury was insufficient for the aggravated assault convictions; (7) the trial court erred in admitting expert testimony about DNA evidence from blood samples; and (8) certain convictions merge for purposes of double jeopardy, namely first-degree murder and felony murder as well as the two convictions for possession of a firearm during a crime of violence. The government concedes that the convictions for first-degree murder and felony murder cannot both stand. In all other respects, we affirm the convictions.

## I. Facts

At three o'clock in the morning on August 5, 1999, Baker, Franklin, Sampson, and Woodland entered the house at 1303 T Street from an alley while heavily armed to steal drugs and money from Gary Lyles, a drug dealer who lived there. Lyles and three other residents of the house were inside at the time. Lyles eventually escaped unharmed and his housemate John Glenn was likewise not injured. Donald Pinkney was shot and killed near the back door. On the second floor, David Buford was stabbed.

Robert Dockery, who lived across the street from 1303 T Street, testified that on August 4, 1999, he worked the 8 p.m. to 5 a.m. housekeeping shift at Howard University and drove his Nissan Pathfinder truck home for a lunch break around midnight. Dockery stated that after he went into his apartment, a man named Joe, later identified as Joe Gaither, who lived in the apart-

[*] Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

ment downstairs knocked on his door. Dockery testified that Gaither asked him to try to convince some people Dockery knew not to kill a friend of Gaither's known as "Don Juan"—later determined to be Donald Pinkney—who lived across the street at 1303 T Street. Dockery declined, in part because he "didn't really believe it, but then again, you can't tell what's gonna happen," but Dockery did go outside.

Dockery testified that when he came outside onto his front porch, he saw four men standing outside Gaither's basement apartment. Dockery made in-court identifications of all four appellants, whom he had known growing up in the same neighborhood, as the four men he saw downstairs. Dockery testified that the appellants all had guns, except for Woodland, who had a knife, and that Baker also had a knife. Dockery further testified that when he saw the four men standing outside, Baker was telling Sampson and Woodland to go upstairs in the house across the street while Baker and Franklin would be going downstairs. Dockery described the guns as follows: Baker had a ".45," Franklin had a "nine," and Sampson had a "Tec." Dockery also said that after he went back inside his apartment, he saw the four men run across the street to an alley behind 1303 T Street, getting within 10 feet of the back door, before Dockery left to go to his truck and head back to work.

Shortly thereafter, when Dockery was pulling off in his truck to return to work, he saw Baker, Franklin, Woodland, and Gaither in the alley where Dockery had been parked behind his own apartment. Gaither asked Dockery if he could take Baker to the hospital. Baker was holding the right side of his neck and Dockery believed he had been shot. Dockery testified that he saw Woodland discard a white mask before running out of the alley. Baker and Franklin got in the truck and

on the way to the hospital, Franklin twice stated that his gun got jammed, and both Baker and Franklin threw guns out of the windows of the truck. After Dockery pulled up to the emergency room and reached over and opened the passenger door, Baker "fell out" of the truck, and Franklin climbed out and left. By this time, it was approximately 3:30 a.m. on August 5 and Dockery went back to work. On cross-examination, Dockery testified that he believed Gaither had something to do with the plan and may have been the "mastermind."

Gaither also testified for the government. Gaither previously lived in the basement of 1911 13th Street N.W., below Dockery's apartment, and Gaither kept a key and continued to use the apartment after he moved out and stopped paying rent in December 1998. At around 11 p.m. on August 4, 1999, Gaither went to the basement apartment on 13th Street and, sometime after midnight, the four appellants came up to his porch and talked with him for about an hour, primarily regarding their plan to rob a drug dealer named Gary Lyles who lived at 1303 T Street. Gaither "really didn't know what was going to go down" and could not determine from the men's behavior whether anything was going to "go down that night" but his "main concern was Donny." According to Gaither, Baker asked him if he wanted to take part, but Gaither declined because "a buddy of mine's was in there." Gaither further testified that he told the appellants "you do what you do, just leave my friend alone." Gaither had previously testified that a "good friend" of his named Donald Pinkney lived at 1303 T Street. At that point, Gaither went upstairs to ask Dockery, who had grown up with and knew the four men, to talk with them to prevent any harm coming to Pinkney. Contrary to Dockery's testimony, Gaither stated that Dockery came out and spoke with the men

for about twenty minutes but Gaither was not entirely sure what Dockery was saying—"word for word I don't know exactly what he said." During that time, Sampson said to Gaither and Dockery "fifteen years later, don't say nothing about this." Gaither denied seeing any weapons in possession of the four appellants.

Gaither testified that he asked Dockery for a ride home and, as he was walking to Dockery's truck, Gaither saw the four appellants walk across the street and disappear into the dark alley that abutted the rear of 1303 T Street, but he never saw them enter the house. Shortly thereafter, Baker ran back toward the truck, breathing hard, and told Dockery to take him to the hospital. Gaither also saw Woodland and Franklin and heard Woodland say to Franklin, "what you do that for." Franklin and Baker got in Dockery's truck. Gaither left through the closest alley and never returned to the neighborhood.

Two residents of 1303 T Street, Gary Lyles and David Buford, also testified at trial. David Buford testified that he was in his second floor bedroom at around 3:15 a.m. on August 5 when he heard what sounded like gunshots, which prompted him to go down the hall to his housemate John Glenn's room. While Buford was in the hallway walking back to his own room, a man who Buford described as about six foot or six foot one inch tall, slender, wearing dark clothing and a ski mask came at him with a knife and what looked to Buford like an automatic weapon. Buford was ordered to get on the floor but instead reached for the assailant's gun and knocked it down the stairs. At that point, Buford was stabbed five or six times. At trial, the government argued that Buford's assailant was Jamal Sampson. Buford was hospitalized for five days, had 40 staples in his left arm and 35–40 staples in his stomach, and was stabbed three times in the head.

The first responding police officer on the scene testified that Buford was calling for help from the upstairs roof when he entered the house and appeared to be in a lot of pain. That officer's partner testified to seeing a large amount of blood running down the stairs to the first floor. One of the paramedics who transported Buford to Howard University Hospital testified that there was so much blood upstairs that he was "slipping and sliding." The paramedic further testified that Buford was alert and oriented when they carried him out the front door of the house. Anthony Onorato testified as a DNA expert concerning the blood evidence collected at the scene and blood samples taken from appellant Baker's clothing at the hospital. Onorato testified that none of the appellants' blood was found at the crime scene and only Baker's blood was recovered off his clothing.

Gary Lyles testified that in August 1999 he occupied the front bedroom on the first floor of the house at 1303 T Street and made a living selling large quantities of cocaine, which he sometimes stored at the house.[1] On the night of the break-in, Lyles returned home at about 1:30 a.m. after a night out with his girlfriend, Regina Curtis, also known as Shorty, and went into his bedroom and shut the door. His roommate Donald Pinkney, who Lyles testified was also a drug dealer, was watching TV in the dining room, and his other housemates John Glenn and David Buford were upstairs sleeping.

Sometime later Lyles was getting ready for bed when he heard "a large bash" from "the rear of the house" and then the "pop,

---

1. The jury also learned that Lyles had four prior convictions stemming from burglary, gun, and drug charges.

pop, pop" of several gunshots. Lyles grabbed his .380 gun from under his mattress and crouched between the bed and the dresser when the door, which had window panes in it that he could see through, began to open and he saw a gun coming around the door with a person peeking into his bedroom. Lyles fired two or three rounds toward the door before hearing someone stumble down the hallway away from his door saying, "Mal, I'm hit, Mal, I'm hit." Lyles testified that the person who appeared at his bedroom with the gun was wearing a ski mask, but he could still see various parts of that person, whom he later identified as Baker. Then another man with a larger weapon opened Lyles' door and started firing, at which point Lyles fired back, crawled to the door, shoved a chair against it and moved away while the shooter kept firing through the door. When the house quieted down, Lyles left with his gun, which he threw down a sewer hole in Maryland. Lyles later identified Baker and Sampson as the first and second individuals who assaulted him. Lyles knew Baker, whom he believed he had shot, as Shorty's "play son" or adopted son. Lyles had also met Sampson three to five times prior to August 5. Sampson's left thumbprint was recovered from the brass doorknob of an iron gate on the back door of the 1303 T Street house.

Lyles also testified that as he left the house after it got quiet, he saw "a body laying on the floor" that he believed was Donald Pinkney. A D.C. medical examiner testified that Pinkney died from heavy bleeding due to gunshot wounds, including three to the back, one to the front torso, one to the side torso, and one to the right arm, caused by four bullets that entered his body. Several .45–caliber cartridge casings were found alongside Pinkney, consistent with the .45–caliber handgun that Dockery saw Baker carrying.

Detective Lazaro Gonzalez testified over objection that Baker made a statement to police after his arrest on September 10, 1999 that Baker "had spoken with a person, a female named Shorty, who told him that at 1303 there was somebody there that had a lot of drugs and money, and she wanted them to go ahead and take it. I believe she mentioned it to him twice, the second time he said we knew what to do from there." Previous conflicting statements of Baker's that were made to police were also introduced, including Baker's first account that he was shot by two men with guns at 11th and V Streets and taken to the hospital by a stranger and Baker's second account that he and Pinkney were playing video games at 1303 T Street when they were taken into the backyard by some guys and made to get on their knees and then Baker was shot in the neck as he fled after hearing gunshots inside the house.

For the defense, only Franklin put on evidence. Franklin called Detective Linda Wingate, who testified that Lyles did not initially claim to recognize anyone in the house that night and that she initially believed Lyles did the shooting inside the house. On cross examination, Wingate testified that she had never spoken to Lyles, but had only spoken to his attorney.

The trial court instructed the jury over objection on aiding and abetting and vicarious liability of co-conspirators under *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), informing the jury that "a conspirator is responsible for offenses committed by his fellow conspirators ... if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of or as a natural consequence of the conspiracy."

The jury returned verdicts of guilty on all counts for all four appellants.

## II. Constructive Amendment of the Indictment

■ All four appellants argue that the indictment was constructively amended by an instruction that was given in response to a jury note. The indictment charged appellants with armed burglary "with intent to assault Donald W. Pinkney, III." [2] The jury sent out a note during deliberations asking:

> Do we have to find that Donald Pinkney was specifically targeted for the charge of first-degree burglary while armed, or that someone, "anyone" in general, was targeted?

The trial court, after receiving written memoranda on the subject from the parties, instructed the jury over objection that:

> [Y]ou may consider in this case that when a defendant's unauthorized presence inside a dwelling is considered, with other circumstances, an inference of the criminal purpose at the time of entry may or may not be drawn. For instance, you may consider whether the circumstances are such as might lead reasonable people, based on their common experience, to conclude beyond a reasonable doubt that the defendant intended to commit a crime or crimes upon the premises, including an assault on anyone inside the premises that the defendant had reason to believe was inside.

■ Appellants argue that this response constituted a constructive amendment of the indictment, which they say is per se reversible error.[3] "Generally described, a constructive amendment occurs when the trial court permits the jury to consider, under the indictment, 'an element of the charge that differs from the specific words of the indictment.'" *Johnson v. United States*, 613 A.2d 1381, 1384 (D.C.1992) (citation omitted); *see also Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). A departure from an indictment's terms "becomes a constructive amendment when facts introduced at trial go to an *essential element* of the offense charged, and the facts are different from the facts that would support the offense charged in the indictment." *Carter, supra* note 3, 826 A.2d at 304 (quoting *Johnson, supra*, 613 A.2d at 1384) (emphasis in original). "Because there can be no constructive amendment unless the departure affects an essential element of the offense, 'convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment.'" *Id.* at 305 (quoting *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985)) (other citation omitted). Appellants argue that the identity of the victim is an essential element of the indictment. *See Long v. United States*, 687 A.2d 1331, 1345 (D.C.

---

2. As the government acknowledges, it is rather inexplicable why it did not seek a count in the indictment charging appellants with burglary with intent to rob Lyles. A burglary may be committed with multiple intents. *See, e.g., Lee v. United States*, 699 A.2d 373, 384 (D.C.1997); *Thorne v. United States*, 471 A.2d 247, 248 (D.C.1983).

3. Appellant Baker acknowledges that a constructive amendment may no longer be per se reversible error, in light of *Arizona v. Fulminante*, 499 U.S. 279, 307–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), *Johnson v. United*

States, 520 U.S. 461, 468–69, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), and *United States v. Cotton*, 535 U.S. 625, 630–31, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002), and appellee agrees. Baker states that, in that event, appellants can demonstrate sufficient prejudice under the harmless error test of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This Court's recent decision in *Carter v. United States*, 826 A.2d 300, 303 (D.C. 2003), reasserted, albeit in dictum, that an impermissible constructive amendment is per se reversible error. We need not reach that issue.

1996) (where appellant charged with assault with intent to rob two victims, Fox and Davis, but evidence showed intent to rob a third person, Foster, the conviction represented an impermissible constructive amendment of the indictment); *Joseph v. United States*, 597 A.2d 14, 17 (D.C.1991) (appellant assaulted one individual with the intent to kill a different person), *cert. denied*, 504 U.S. 928, 112 S.Ct. 1988, 118 L.Ed.2d 585 (1992).[4] In these cases, however, the evidence was clear that at the time of the assault, the defendants had in mind a person to be robbed or killed completely distinct from the person named in the indictment.

 For burglary, the intent to commit a crime on the premises must be formed prior to entry. *See Warrick v. United States*, 528 A.2d 438, 442 (D.C. 1987) (reversing conviction for burglary with intent to assault where appellant entered a house while armed with a knife with intent to steal and committed an assault once inside). Appellants argue that the situation here is the same as in *Warrick*, in that appellants entered a house while armed with the intent to commit a robbery and then assaulted someone inside the house. The *Warrick* court was dealing with a factual situation in which, in its view, the only evidence of the appellant's intent to assault was the fact that when he entered the home, he was armed with a dangerous weapon. "This evidence [of being armed] might support an inference that [they] intended to use the weapon[s] *if* somebody attempted to interfere with [their] taking of property. A conviction for burglary cannot rest on an 'if'. Were we to hold that intent to commit assault may be inferred from possession of a dangerous weapon, such an inference could be made in every case in which a defendant was charged with burglary while armed, substantially relieving the government of the burden of proving intent in such cases." *Id.* at 442 (emphasis in original). However, as the *Warrick* court itself recognized, "other circumstances" could exist that would be sufficient to support the necessary intent upon entry. "Unauthorized presence in another's premises does not alone support an inference of criminal purpose at the time of entry; but when the unauthorized presence is aided by other circumstances, such an inference may be drawn." *Id.* (citations omitted).[5]

Appellants contend that they could not have entered 1303 T Street with the intent to assault Pinkney because they did not know he was there. Appellants also point to the testimony of both Dockery and Gaither about a possible attempt to prevent harm to Pinkney, which would negate the idea that the assault was intended when the appellants entered the T Street house. However, the trial court instructed the jury that they could do exactly what our case law has said was acceptable, *i.e.*,

---

4. That is not to say that the exact name of the victim is necessarily a prerequisite. In *Joseph*, the indictment charged that the defendant had "assaulted another with the intent to kill him." 597 A.2d at 17. We did not suggest that the failure to designate the name of the victim was the problem, but rather that the proof showed that the defendant had assaulted X with the intent to kill Y. (The government at trial proceeded on a theory of transferred intent. *Id.* at 18.)

5. *See Lee v. United States*, 699 A.2d 373, 383–84 (D.C.1997) (we use a "case-by-case approach" to determine the presence of "other circumstances"); *Johnson v. United States*, 613 A.2d 888, 898–901 (D.C.1992) (appellant's past violence in relationship and hostile behavior before entering house sufficient "other circumstances" to support burglary conviction for intent to commit assault upon entry); *McKinnon v. United States*, 644 A.2d 438, 442 (D.C.1994) (distinguishing *Warrick* as case where appellant, in process of stealing a television set, "*unexpectedly* encountered a householder and assaulted him with the knife") (emphasis in original).

consider the totality of the circumstances in making a determination of intent and infer that appellants intended to assault anyone, including Pinkney, who they had reason to believe was inside. By informing the jury that all the evidence pointing to the appellants' reasons for entering the T Street house could be considered on the issue of intent, the trial court was not impermissibly expanding the indictment but was pointing out the facts that, if proven, would support a finding that the appellants had the requisite intent.

There are "other circumstances" here for the jury to weigh in determining whether appellants' intent encompassed an assault on Pinkney. The case before us involves far more than a simple "if"; that is, carrying a knife on the mere possibility of interference. Appellants were entering the home of a known drug dealer at three o'clock in the morning. They knew, it could be inferred from the testimony of Dockery and Gaither, that the home was inhabited by at least one other person (the friend of Gaither, if not by name) and perhaps more, who could be expected to be there at that hour of the night. The fact that they entered heavily armed reflected their expectation, if not near certainty, that they would meet resistance from one or more of those inhabitants, and indeed the initial gunman appeared prepared to fire at Lyles even as he presumably slept. Dividing their forces into an upstairs and downstairs component also reflected the expectation of resistance. Pinkney was named in the indictment as a target of their expectations and intent and indeed was the person who the government proved was assaulted. We see no justification in these circumstances to conclude that the trial court somehow constructively amended the indictment by its reinstruction.

In *Carter, supra*, we expressly adopted the principle that "[a] constructive amendment of the indictment can occur if, *and only if*, the prosecution relies at trial on a complex of facts distinctly different from that which the grand jury set forth in the indictment." 826 A.2d at 306 (emphasis in original) (citation omitted). We cannot say that that happened here, where what the government proved was an assault upon the very person named in the indictment and that person was included, as the reinstruction stated, within the individuals inside the premises that the appellants had reason to believe were inside.

■ Viewing the evidence in the light most favorable to the government, *Johnson, supra*, 613 A.2d at 898, there was no constructive amendment of the indictment on an "essential element" of the offense when the trial court gave an instruction that was consistent with *Johnson* and served to advise the jury as to how to evaluate the circumstantial evidence of intent.[6] Thus, the jury's determination that there was sufficient evidence will be reversed "only if there is *no* evidence upon which a reasonable mind could infer guilt beyond a reasonable doubt." *Id.* (emphasis in original). Although hardly overwhelming, the proof was at least minimally sufficient. As already expounded at greater length, there was evidence that appellants knew Pinkney inhabited the house

6. Sampson argues specifically that there was substantial prejudice to appellants because the defense strategy was not crafted to demonstrate that appellants did not intend to assault anyone on the premises. The obvious defense strategy, according to Sampson, was *not* to press Gaither and Dockery as to whether there was a discussion among the appellants about assaulting Pinkney because it was the government's burden to show that appellants had that intent. The government did meet that burden by demonstrating intent through evidence of the totality of the circumstances irrespective of any defense strategy to not probe for information about any discussions pertaining to plans to assault Pinkney.

and it was 3 a.m. in the morning when people are normally at home. Gaither's testimony that he was concerned about Pinkney's safety indicated that Gaither believed Pinkney was likely at home and expressed that concern. Appellants were heavily armed to meet resistance, and there was evidence that Pinkney was assaulted almost immediately after entry into the house based on both Buford's and Lyles' accounts.[7]

### III. Admission of Baker's Statement to Police

Appellants Franklin, Sampson, and Woodland argue that admission in a joint trial of Baker's above-described statement to Detective Gonzalez about Baker's conversation with Lyles' girlfriend (see page 996 *supra*) violated their Confrontation Clause rights under the Sixth Amendment. The trial court denied motions for severance and permitted the detective to testify about the statement with the names of Baker's co-defendants redacted.[8] A limiting instruction, indicating that the statement could only be used against Baker, was given four times: during opening statements, immediately when the testimo-

ny was received, at the final jury instructions, and during closing arguments.

The government, in opposing the appellants' motions to sever, had argued that Baker's statement was either in furtherance of the conspiracy or a statement against penal interest, and therefore admissible in a joint conspiracy trial against all the defendants. The trial court did not admit the statement on either of those grounds, but allowed a redacted statement to be admitted against Baker alone as a party admission with a limiting instruction.[9]

On appeal, appellants now invoke the distinct ground that the redacted statement was inadmissible under *Akins v. United States*, 679 A.2d 1017 (D.C.1996). In *Akins*, a *Pinkerton* instruction on vicarious liability in a conspiracy was found to nullify a limiting instruction and the appellants were given a new trial. *Id.* at 1031. Statements to the police of two of five co-defendants, Akins and Taper, indicating that they had possession of the victim's wallet, were admitted as rebuttal evidence against Akins and Taper as statements of a party opponent. *Id.* at 1027. A limiting instruction was given that the statements could be used only against Akins, Taper,

---

7. Baker further argues that there was a prejudicial variance from the indictment, which was substantial enough to warrant reversal. *Carter, supra,* 826 A.2d at 304 ("[a] variance ... occurs when the facts proved at trial materially differ from the facts [alleged] in the indictment but the essential elements of the offense are the same") (citation omitted). Baker contends that even if the burglary conviction was not "on the basis of a complex of facts 'distinctly different' from the facts alleged by the grand jury," *id.* at 306, he was prejudiced by reliance on the words of the indictment—that the entry into the house was with the intent to assault Pinkney. Here, as in *Carter*, there was no prejudicial variance because the "events [proven to the jury] and those alleged in the indictment occurred on the same day, at the same time, at the same location, and [by] the same individuals," *id.*,

and the intent to assault Pinkney and to rob Lyles were both shown by the same evidence.

8. Appellants' argument to the trial court was that Baker's statements to police could not be sufficiently redacted to eliminate any reference to his co-defendants' existence.

9. Woodland asserts on appeal that the trial court abused its discretion in allowing the statement with redactions at a joint trial because of a substantial risk that the jury would consider the statement in deciding the guilt of the other appellants even with the limiting instructions. This "substantial risk" argument, "where a defendant's name and any reference to the defendant's existence are eliminated," was squarely rejected in *Plater v. United States*, 745 A.2d 953, 960 (D.C.2000).

and another co-defendant named Davis, who had introduced evidence in his defense case that the government sought to rebut with admission of Akins' and Taper's statements. *Id.* Later, "the jury was instructed on the nature of conspiracy liability, which essentially requires that proof of one defendant's guilt be counted against all members of the conspiracy." *Id.* The *Akins* court opinion stated that "in a joint conspiracy trial where the government relies on a theory of vicarious liability, statements may not be introduced under the statements of party opponent exception to the rule against hearsay—or any other hearsay exception that is not reliability based—unless they are admissible as co-conspirators' statements in furtherance of the conspiracy." *Id.* at 1031.[10]

Invoking *Akins,* appellants now assert that, even if the statement was admissible against Baker as a party admission, a limiting instruction (which was given multiple times here) was not enough to guard against prejudicial effect in a situation where a jury could find Baker guilty based on the statement and then find the other three appellants guilty based on vicarious liability.[11] The government argues with considerable force that we should review any error under *Akins* on a plain error standard. We agree.

"As a general proposition, 'objections must be made with reasonable specificity; the [trial] judge must be fairly apprised as to the question on which he is being asked to rule.'" *Newby v. United States,* 797 A.2d 1233, 1237 (D.C.2002) (citing *Hunter v. United States,* 606 A.2d 139, 144 (D.C.1992)). "The purpose of requiring a specific objection is to enable the prosecution to respond to any contentions raised and to make it possible for the trial judge to correct the situation without jettisoning the trial." *Hunter,* 606 A.2d at 144. Appellants' objections to admission of Baker's statements and later objections to the *Pinkerton* instruction [12] never included the Confrontation Clause assertion now made on appeal, *viz.* a jury could find Baker guilty based on his statements, which were admissible only against Baker, a non-testifying co-defendant, and then convict the other appellants based on vicarious liability.

[10] While it is true, as appellants argue, that citation to a particular case is not a prerequisite to the preservation of an objection for appellate review, *see Tindle v. United States,* 778 A.2d 1077, 1082 (D.C. 2001), the appellants' failure to either cite to *Akins* or object that the combination of the admission of Baker's redacted statements and the *Pinkerton* instruction would

---

10. But see note 13 infra. The specific statements in *Akins* were not admissible under the hearsay exception for co-conspirator statements made in furtherance of a conspiracy because the statements were made after, and not in furtherance of, the conspiracy. *Id.* at 1028. Whether this hearsay exception for co-conspirator statements can survive the holding in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), may be an open issue.

11. The trial court's initial conspiracy instruction referred only to felony murder and thus appeared to limit vicarious liability to that charge only. However, the trial court later responded to a jury note by instructing the

jury that the theory applied to all defendants on all counts.

12. Appellants objected to the *Pinkerton* instruction solely on the basis that there was no conspiracy charge in the indictment and, while conceding that this court in *Thomas,* section IV *infra,* had said no conspiracy charge was necessary, wanted to preserve the objection in case that precedent changed. In none of the other discussions of the *Pinkerton* instruction did any defense counsel (or anyone else) mention anything about Baker's statement. See Super. Ct.Crim. R. 30 (objection to instruction must "stat[e] distinctly the matter to which that party objects and the grounds of the objection").

violate their Confrontation Clause rights meant that the trial court was not "fairly apprised" that appellants sought relief based on that claim. *Newby,* 797 A.2d at 1237. Appellants point out that *Akins* was cited to the trial court by the government in its "Omnibus Opposition to Defendants' Motion to Sever." But the government invoked *Akins* to support the government's then pressed argument that Baker's statement was admissible as being in furtherance of a conspiracy. As indicated above, Baker's statement was admitted only against him, as a party admission, and the government has not renewed its argument that the statement was in furtherance of a conspiracy. At no point after the government filed its written opposition, whether during argument on the motions to sever, when Baker's statement was testified to at trial, during discussion of the *Pinkerton* instruction, or during the trial court's further explanation of its denial of the motions to sever at the conclusion of trial, did the appellants make any objection that invoked the *Akins* principle. Because "the point was not preserved .... we review for plain error." *Hunter,* 606 A.2d at 144.[13]

▆▆▆▆ Plain error review permits us to grant a remedy where (1) there is error, (2) the error is plain, meaning "clear" or "obvious," and (3) the error affected substantial rights. *United States v. Olano,* 507 U.S. 725, 732–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Even where the error meets these basic requirements, discretionary relief need be granted only where the error "seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 736, 113 S.Ct. 1770.[14] We cannot say on this record that the error was either "clear" or "obvious." Counsel for none of the three appellants who now assert their Confrontation Clause rights under *Akins,* nor the trial court, recognized the error despite the filing and review of written motions on the subject of the admissibility of Baker's statements in a joint trial and repeated arguments made orally regarding severance both pre-trial and at the conclusion of trial. As we said in *Akins* itself, the Confrontation Clause issue as it relates to statements of co-defendants is "one of some complexity," 679 A.2d at 1032 n. 13, and indeed the precise breadth of the *Akins* holding is not entirely clear.[15]

▆▆▆▆ Even if we were to conclude that the error was plain, we do not think the error can be said to have "affected the outcome of the [trial] court proceedings," *Olano,* 507 U.S. at 733, 113 S.Ct. 1770,[16] much less "seriously affected the fairness,

---

**13.** The need for a proper objection is illustrated by this very case. In *Akins,* Judge Farrell in his necessary concurrence to the holding expressed the qualification that a limiting instruction might be devised that would permit the introduction of a co-defendant's statement in a *Pinkerton* context. 679 A.2d at 1037. Had a proper objection been made, the government would have had the opportunity to attempt to devise such an instruction. Alternatively, the government might have elected either to withdraw the request for a *Pinkerton* instruction or to eschew use of the Baker statement.

**14.** In our own cases, we have phrased the test as "manifest injustice," *York v. United States,*

803 A.2d 1009, 1011 (D.C.2002), or a showing that the error "resulted in a clear miscarriage of justice." *Perkins v. United States,* 760 A.2d 604, 609 (D.C.2000).

**15.** See note 13 supra. Furthermore, Judge Schwelb, in dissent, suggested that the specifics of the limiting instruction overrode the generality of the *Pinkerton* instruction, at least in the circumstances of that case.

**16.** In plain error review, the burden of persuasion with respect to prejudice is on the defendant. *Olano,* 507 U.S. at 734, 113 S.Ct. 1770.

integrity, or public reputation of the judicial proceedings." *Id.* at 736, 113 S.Ct. 1770. Baker's statement that "we knew what to do" was both vague and cumulative of much weightier evidence that Baker, along with his co-conspirators, planned and carried out a raid on the 1303 T Street house in the early morning hours of August 5. The statement itself offers only an imprecise notion that Baker, along with unnamed and unenumerated others, was going to do *something* with the information provided by Lyles' girlfriend. The statement makes reference to no specific plans.

There was significant other evidence of an intent on the part of the four appellants to enter the 1303 T Street house for the purpose of seizing drugs and money, which was the only piece of information that Baker's statement could arguably have offered. Gaither testified to a discussion with appellants during which they talked about breaking into 1303 T Street and robbing Lyles and Baker asked Gaither if he wanted to participate. Dockery testified to a discussion in which appellants set out their plans for breaking into the house. Dockery further testified that the appellants were heavily armed at this point, demonstrating that they did indeed have a plan to carry out that would require the use of firearms for force and protection.

A further indication of the lack of import of Baker's statement is its omission from the government's initial closing argument. *See Morten v. United States*, 856 A.2d 595, 602 (D.C.2004) ("A prosecutor's 'stress[ ] upon the centrality' of particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial.") (citing *Allen v. United States*, 837 A.2d 917, 923 (D.C.2003)). If, as appellants contend, the statement "served the function of curing the shortcomings of the government's other evidence, rendering insignificant various peculiarities in witnesses' testimony and making the dubious seem plausible," surely the government would have seen fit to remind the jury of this statement during closing argument seven days after it was testified to by Detective Gonzalez. As it happened, the government only mentioned Baker's statements in its rebuttal closing argument.[17] Finally, the credibility of Baker's final statement to police was highly questionable after the jury heard that he had given Detective Gonzalez three very different false accounts as to how he had come to be shot that night.

Furthermore, the limiting instruction made it clear that the evidence was relevant only to Baker's guilt, as to which the *Pinkerton* liability was only derivative. The evidence of Baker's guilt, apart from the statement, was very strong, including that Baker ran with the other appellants towards the house, while armed, immediately after discussing their plans, Lyles shot at Baker inside the house, Dockery transported Baker to the hospital with a gunshot wound that night, the testimony of Dockery and Gaither describing Baker's involvement in the planning of the burglary, and the .45–caliber cartridge casings found alongside Pinkney's dead body, consistent with the .45–caliber handgun that Dockery saw Baker carrying before and after the break-in. Based on the weight of the evidence demonstrating Baker's guilt and the evidence implicating all four appel-

---

17. In rebuttal, the government sought to explain why Detective Gonzalez did not record Baker's statements to the police and, in so doing, described Baker's statement that "we knew what to do" as a self-serving statement made after his arrest: "This is not a confession where he admits to killing Donald Pinkney. These are statements that he uses to get himself off the hook." The prosecutor went on to say that Baker's statement did corroborate other evidence that put Baker inside 1303 T Street that night.

lants in a conspiracy to enter the house for unlawful purposes, we are quite unable to say that the admission of Baker's·statement combined with a *Pinkerton* instruction on vicarious liability was plain error in that it affected the outcome of the court proceedings.

■■■■■ Even if appellants had preserved the argument under *Akins,* we would conclude that the error was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), for substantially the same reasons that the introduction of Baker's statement did not affect the other appellants' substantial rights. Under the test in *Chapman,* we must reverse appellants' convictions unless the government has demonstrated "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. 824. "Thus, unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required." *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *see also Neder v. United States,* 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (stating that erroneous admission or exclusion of evidence in violation of Fifth or Sixth Amendment rights is subject to a harmless error inquiry that asks "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?"); *Morten, supra.*

In *Morten, supra,* erroneous admission of the statements of co-conspirators who had pled guilty,· against appellants in a trial on murder and conspiracy charges, was not harmless. This case is different from *Morten.* The prosecutor in *Morten* repeatedly referred to the co-conspirators' statements in closing arguments, including inviting the jury to review one of the co-conspirator's videotaped statements during deliberations. Further, the primary witness, Barnes, relied on by the government in *Morten* to prove the existence of a conspiracy, was testifying as part of a plea agreement and "was vigorously challenged as someone with weighty reasons to fabricate or embellish," which led the prosecutor to "encourage[ ] the jury to rely more heavily on [a co-conspirator's] statement." Here, neither Dockery nor Gaither were charged with any crime [18] relating to the incidents at 1303 T Street and the government repeatedly cited as "the cornerstone" of its case the fact that "Baker got shot at 1303 T Street." In contrast to the marginal relevance of Baker's statement, the co-conspirator's statement in *Morten* went to the very heart of the government's case. Furthermore, in *Morten,* there was a specific conspiracy count in the indictment and the evidence was admitted against all defendants.

■■■ For these reasons, we would conclude that it is "clear beyond a reasonable doubt that a rational jury would have found [the appellants] guilty absent the error" of introducing Baker's statement.[19] *Neder, supra,* 527 U.S. at 18, 119 S.Ct. 1827.

18. Gaither was impeached with the fact that he was on parole in Maryland at the time of the August 5, 1999 incidents at 1303 T Street and that, if he had been charged with a crime for any involvement that night, the Maryland authorities could have been notified.

19. Woodland also states that his case should have been severed because there was disproportionate evidence implicating the other appellants. *See Christian v. United States,* 394 A.2d 1, 21 (D.C.1978) (finding manifest prejudice "where the evidence of a defendant's complicity in the overall criminal venture is de minimis when compared to the evidence against his codefendants"), *cert. denied sub. nom., Clark v. United States,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979). Woodland was observed by Gaither talking with the other defendants about robbing Lyles, at a time when Dockery testified that Woodland was outside Gaither's apartment armed with a knife. Woodland was also seen running into the alley behind 1303 T Street with the

*IV. Unindicted Theory of Co–Conspirator Liability*

■ Appellants Franklin and Sampson argue that the *Pinkerton* instruction on the vicarious liability of co-conspirators was unconstitutional because there was no indicted conspiracy charge. In *Pinkerton*, the Supreme Court held that a co-conspirator may be held liable for an offense directly committed by another co-conspirator if the crime was committed in furtherance of the conspiracy, was within the scope of the conspiracy, and could be "reasonably foreseen as a necessary and natural consequence of the unlawful agreement." 328 U.S. at 647–48, 66 S.Ct. 1180. "[I]n order to convict a co-conspirator for the substantive crimes by another conspirator, the jury must be instructed that they must find that the substantive offense was committed in furtherance of the conspiracy and was a reasonably foreseeable consequence of the agreement." *Gordon v. United States*, 783 A.2d 575, 582 (D.C. 2001). We have held that a *Pinkerton* instruction can properly be given even without an indicted conspiracy charge. *Thomas v. United States*, 748 A.2d 931, 935 (D.C.2000), *cert. denied*, 534 U.S. 917, 122 S.Ct. 263, 151 L.Ed.2d 192 (2001).

■ It is argued, however, that the holding of *Thomas* has been undercut by two subsequent Supreme Court decisions. Any element of a criminal offense that must be proven beyond a reasonable doubt must be submitted to the jury. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Any fact that increases the criminal penalty beyond the statutory maximum, an enhancement factor, must be included in the indictment. *United States v. Cotton*, 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002); *see also Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (facts supporting a finding that increases a criminal penalty beyond the statutory maximum of the standard range for an offense must be determined by a jury or admitted by the defendant). Appellant argues that because a *Pinkerton* instruction provides a jury with an alternative definition of the crime, it functions effectively like an element of the offense and therefore must be indicted. However, we reasoned in *Thomas* that a theory of liability such as the conspiratorial theory argued by the government here is not equal to an element of a crime that must be charged in the indictment. 748 A.2d at 935. We also note here that a *Pinkerton* theory of conspiratorial liability does not increase the penalty for any charged crime beyond its statutory maximum, because *Pinkerton* liability is a basis for a conviction not a sentencing enhancement factor. We are not satisfied that the Supreme Court holdings are sufficiently on point to justify our disregard of a square holding of this court binding upon us as a panel.[20] *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971).

other defendants, and then running with the others into the alley behind Dockery's apartment shortly thereafter. Dockery testified that Woodland was discarding a white mask in the alley as he ran from the scene. Gaither testified that Woodland said to Franklin, "what you do that for?" Based on this evidence specifically implicating Woodland and the fact that all of the evidence properly admitted at trial without limiting instructions would have been admissible against Woodland in his own trial, he has failed to demonstrate manifest prejudice from denial of his motion to sever. *See Elliott v. United States*, 633 A.2d 27, 34 (D.C.1993).

20. Appellants additionally assert that not including the elements of conspiracy in the indictment was an "even more fundamental failure" than failing to include a sentence enhancement as in *Cotton* because conspiracy is recognized as a separate and distinct crime. However, appellants were not charged with nor convicted of the crime of conspiracy here.

## V. Evidence to Support Aiding and Abetting or Conspiracy

 Baker, Sampson, and Woodland all make arguments regarding the sufficiency of the evidence with regard to the theories of aiding and abetting and conspiracy. We will not reverse a conviction for insufficient evidence "unless there is no evidence from which a 'reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *Perry v. United States,* 812 A.2d 924, 930 (D.C.2002) (citation omitted).

 Appellant Baker argues that his convictions for aggravated assault and assault with intent to kill as to Buford are supported by insufficient evidence of aiding and abetting or a conspiracy.[21] Baker asserts that vicarious liability under a conspiracy theory is grounded entirely on a statement testified to by Dockery, that Baker told Sampson and Woodland to go upstairs at 1303 T Street, while Baker and Franklin would go downstairs. Baker argues that this evidence shows, if Baker entered the house, that it was only to rob someone on the first floor, and he could not have aided and abetted Sampson in the assault on Buford on the second floor. *See Jones v. United States,* 625 A.2d 281, 288–89 (D.C.1993) (no aiding and abetting where appellant was present but there was no evidence that he participated or assisted in the crime). Baker makes much of the fact that there were essentially two "crime scenes"—one on the first floor involving him, and one on the second floor to which he was not a party.

However, the jury could have fairly concluded the assault on Buford was part of a continuous chain of events that started when appellants were across the street planning to enter the presumably (at 3 a.m.) occupied house. *See Lee v. United States,* 699 A.2d 373, 386 (D.C.1997) (reasonable jury could have found that shootings [or a stabbing] were "a means of facilitating the successful completion of the armed burglary, and that the burglary and the [stabbing] were 'all part of one continuous chain of events'") (citation omitted); *see also Price v. United States,* 813 A.2d 169, 176–77 (D.C.2002) (evidence sufficient for aiding and abetting where appellant arrived with two companions, who had visible guns, and remained with them as one made threats to kill and the other shot two people).

 Baker argues that he is also not liable under a conspiracy theory of liability because an assault on Buford was not a "reasonably foreseeable consequence" of the purported conspiracy to rob Lyles and assault Pinkney. *Gordon, supra,* 783 A.2d at 582. In *Pinkerton, supra,* as discussed previously, the Supreme Court held that a co-conspirator may be held liable for an offense directly committed by another co-conspirator if the crime was committed in furtherance and within the scope of the conspiracy and was reasonably foreseeable. 328 U.S. at 647–48, 66 S.Ct. 1180. There was a continuous chain of events planned by the appellants prior to entering the house, which supports the conviction on the basis of a conspiracy theory.[22]

 Appellant Sampson argues that there is insufficient evidence to find that he aided and abetted the murder of Pinkney or assault of Buford.[23] Sampson contends that there was no evidence he assisted or participated in the crimes with

---

21. The government asserted at trial that Baker was the shooter in Pinkney's murder.

22. For this same reason, Sampson's argument that there was insufficient evidence that the murder and assault were a reasonably foreseeable consequence of the burglary conspiracy must fail.

23. Sampson also makes the argument that there was no credible evidence he was ever inside 1303 T Street on the night of August 4–5, 1999, because his fingerprint found on the doorknob of the back door's iron gate could have been there for up to a month. However, Sampson was identified by Lyles as being in the house based on a visual recognition, after

culpable purpose or guilty knowledge. *See Hordge v. United States*, 545 A.2d 1249, 1254 (D.C.1988).

Because there was sufficient evidence that Sampson committed the burglary, the only required showing for aiding and abetting for felony murder is that there be a "causal connection" between the murder and burglary. *Lee, supra,* 699 A.2d at 385. Here, as in *Lee,* there was an unbroken chain of events, beginning with the men entering the house with the intent to rob and assault, which included the murder that happened inside the house within moments of entry. *Id.* Further, there was evidence that Sampson not only aided and abetted, but was the principal actor in the assault on Buford, who described his assailant as carrying a gun consistent with the one Dockery and Lyles testified that Sampson was carrying. Dockery also heard Baker direct Sampson to go upstairs in the house upon entry.

Woodland argues that there was no direct evidence that he was present at 1303 T Street and vicarious liability under *Pinkerton* was the only possible basis for his convictions. With that in mind, Woodland asserts that there was insufficient evidence that he participated in a conspiracy where no witness testified to any state-ment made by Woodland about participating in or approving of the conspiracy.

There is evidence that: (1) Woodland was with the group while they were making plans at 1911 13th Street, (2) he was armed with a knife, (3) Baker instructed him to go upstairs in the T Street house, and (4) he ran across the street to the backyard of the T Street house with the group. Minutes later, Woodland was with Baker and Franklin in the alley behind Dockery's house, and was seen discarding a white mask as he ran. While there is only circumstantial evidence that Woodland actually entered the house on T Street, because no one places him there, the weight of the other evidence is sufficient to support a finding by the jury that he participated in the conspiracy.[24] *See Clark v. United States*, 755 A.2d 1026, 1030 (D.C.2000) (equal weight accorded to direct and circumstantial evidence).

## VI. *Evidence of Premeditation and Deliberation*

Appellants were convicted of first-degree murder in the shooting death of Donald Pinkney. First-degree murder requires that the killing be premeditated and deliberate, a requirement that appellants contend was not proven beyond a

---

having met Sampson three to five times previously, and the statement testified to by Lyles that someone called out "Mal, I'm hit, Mal, I'm hit," with "Mal" being short for "Jamal." Sampson's reliance on cases involving the reliability of a sole stranger identification is unpersuasive.

Sampson further argues that a conviction for possession of a firearm during a crime of violence (PFCV) requires actual or constructive possession of a weapon and the evidence was insufficient to demonstrate that he was armed. Sampson cites conflicting testimony by witness Dockery as to whether he actually saw a gun in Sampson's waistband or only saw a bulge there under Sampson's shirt. Sampson argues that the bulge Dockery saw was likely his colostomy bag, the presence of

which was stipulated to at trial. However, Lyles also testified that Sampson was carrying and firing a weapon inside the house.

24. Woodland points to witness Gaither's testimony that Woodland said to Franklin, when they were in the alley after leaving the T Street house, "what you do that for," as evidence that Woodland disapproved of the conspiracy. This statement after the fact cannot be construed as a withdrawal from the conspiracy. *See, e.g., Kelly v. United States*, 639 A.2d 86, 91 (D.C.1994); *Harris v. United States*, 377 A.2d 34, 38 (D.C.1977). While the statement could be interpreted to mean that Woodland did not actually go into the T Street house, that determination was properly within the province of the jury.

reasonable doubt. Premeditation means that, before acting, Baker, who the government argued was Pinkney's shooter, reached a definite decision to kill. *See Busey v. United States,* 747 A.2d 1153, 1160–61 (D.C.2000). Deliberation means that Baker acted with consideration and reflection. *Id.* at 1161. The government need not prove that Baker's consideration and reflection lasted any particular amount of time, and the time involved may be as brief as a few seconds, but "the evidence must demonstrate that the accused did not kill compulsively, in the heat of passion, or in an orgy of frenzied activity." *Hall v. United States,* 454 A.2d 314, 317–18 (D.C. 1982) (citation omitted).

The government's theory of premeditation at trial was that the appellants' intent to rob Lyles, coupled with a fear of being identified, led to a deliberate decision to kill anyone on the premises who witnessed the crime. Further probative evidence of premeditation is taking the weapon to the crime scene. *See Mills v. United States,* 599 A.2d 775, 781 (D.C.1991). The government also relies on *Busey, supra,* where robbery was recognized as a motive for murder and there was sufficient evidence to support a first-degree murder conviction where the defendant carried a gun with him to the scene of the murder and asked to speak to the victim alone. 747 A.2d at 1162.

■ Appellants argue that the three shots being fired almost immediately upon entering the house is evidence of frenzied activity resulting from the surprise of Pinkney being there.[25] In response, appellee states that the manner in which the murder was executed was evidence of the implementation of a calculated plan, one that appellants carried out knowing that Pinkney would likely be in the house. Appellee argues that Pinkney was killed be-

cause he was between appellants and Lyles' bedroom when appellants entered the rear of the house. Appellee points to the testimony of the medical examiner that Pinkney's wounds were consistent with being on his knees at the time of the shooting, which counters the notion that this was a "panic" or "frenzied" killing. *Hall, supra,* 454 A.2d at 318 (eight gunshot wounds fired at close range with no sign of struggle probative of "planned and calculated intent to kill"). Overall, the very nature of the extensive planning of the break-in and the heavy arming of all participants suggested a degree of premeditation and deliberation that could carry over to the killing itself.

Given the deferential standard of review in evaluating a jury's weighing of the evidence, and viewing the evidence in the light most favorable to the government, *Johnson v. United States,* 820 A.2d 551, 560 (D.C.2003), we conclude that there is sufficient evidence of premeditation and deliberation to support a first-degree murder conviction.

### VII. Evidence of Serious Bodily Injury for Aggravated Assault

■ Appellants Franklin and Sampson argue that there was insufficient evidence that Buford sustained "serious bodily injury," an element that must be proven for an aggravated assault conviction.

In *Nixon v. United States,* 730 A.2d 145, 150 (D.C.), *cert. denied,* 528 U.S. 899, 120 S.Ct. 233, 145 L.Ed.2d 196 (1999), we determined that "serious bodily injury" for purposes of the aggravated assault statute should be defined as the term is defined in the sentencing portion of the sexual abuse statute, now codified at D.C.Code § 22–3001(7) (2001). Under that statute, "serious bodily injury" is "bodily injury that involves a substantial risk of death, uncon-

---

**25.** Baker disavows the notion of a frenzied killing in his reply brief, noting that his intent

was to rob Lyles and, if he killed Pinkney, that was an incidental and impulsive act.

sciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." *Nixon,* 730 A.2d at 149. This exact wording was given to the jury in their instructions.

The government argued here that there was evidence of serious bodily injury under the "extreme physical pain" prong and the trial court determined that there was enough evidence to support such a finding. Appellants assert that the evidence was insufficient to establish extreme physical pain,[26] *Nixon,* 730 A.2d at 150–51, and knife wounds are not per se serious bodily injuries, *Zeledon v. United States,* 770 A.2d 972, 977 (D.C.2001). We cannot say that where a man has suffered wounds as severe as Buford, necessitating 40 staples in his left forearm and 35 to 40 staples in his abdomen, and there is corroborating evidence of severe blood loss from testimony of the responding police officers and paramedics, that the trial court erred in finding that there was sufficient evidence of extreme physical pain to support a conviction for aggravated assault. *See Gathy v. United States,* 754 A.2d 912, 918 (D.C. 2000) (where victim "never described [his pain] in terms that would indicate it was 'extreme'... a reasonable juror could infer from the nature of his injuries, and from his reaction to them, that the pain was extreme").[27]

## VIII. Admission of Expert DNA Testimony

Appellant Baker argues that the testimony of expert witness Anthony Onorato, regarding DNA evidence from blood samples, should have been excluded because its prejudice outweighed any probative value. An objection was made to the trial court based on relevance and prejudice and the trial court tentatively ruled that the evidence was admissible. No further objections were made during or after Onorato's testimony.

Baker argues that the tentative ruling as to admissibility was an abuse of discretion due to the lack of any probative value from Onorato's testimony because no appellant's blood was found at the crime scene [28] and the testimony was highly prejudicial because it displayed for the jury the bloodiness of the crime scene.[29] There was probative value to the fact that Buford's blood was found on the back of the rear door, but the medics took him out of the house via the front door, suggesting that someone else had Buford's blood on their person when exiting the rear door. Baker argues that Onorato was not the one who testified to where Buford's blood was found, but this ignores the fact that without Onorato's testimony, the jury would not have known how the collected blood samples were identified.

26. Buford did not give testimony regarding the amount of pain that he experienced.

27. Buford testified that he did not lose consciousness following the attack. Appellants argue that "serious bodily injury" includes only actual unconsciousness, not a "substantial risk of" unconsciousness, because the phrase "substantial risk of" in the statute only modifies "death" and not the other conditions listed. *But see Gathy, supra,* 754 A.2d at 918 (finding sufficient evidence to support aggravated assault conviction where "a reasonable juror could reasonably conclude that there

was a 'substantial risk of unconsciousness' "). We need not reach the issue here where there is sufficient evidence of extreme physical pain.

28. Baker's DNA was taken off his clothing that was recovered at the hospital.

29. There was already far more damaging evidence of that bloodiness before the jury, in the form of the paramedic's testimony that he was "slipping and sliding" going up the upstairs hallway because of the amount of blood.

■ A trial court's evidentiary ruling is reviewed for abuse of discretion. *Nixon v. United States*, 728 A.2d 582, 594 (D.C. 1999), *cert. denied*, 528 U.S. 1098, 120 S.Ct. 841, 145 L.Ed.2d 707 (2000). Baker has not made a showing that the trial court abused its discretion in conditionally admitting the testimony, particularly where no objections were made during or after Onorato's testimony.

## IX. Merger of Convictions

■ Appellants argue that several of their convictions merge for purposes of double jeopardy. The first-degree murder and felony murder convictions merge, as do the felony murder and burglary convictions. Appellee agrees that both murder convictions cannot stand and requests a remand to the trial court to vacate the felony murder conviction, which would allow for the burglary conviction to stand. *Jackson v. United States*, 750 A.2d 551, 552 (D.C.2000).

■ Appellants also argue that the two possession of a firearm during a crime of violence (PFCV) convictions must merge.[30] The predicate felonies for the two convictions were the burglary with intent to assault Pinkney and the murder (charged as first-degree and felony murder) of Pinkney. Appellants argue that because the crimes were committed minutes apart on the same victim, the convictions should merge. *See Nixon, supra*, 730 A.2d at 152–53 (finding that PFCV counts merged because all rested on a single weapon possession even though there were different victims and different predicate crimes where appellant shot into an occupied vehicle). Appellee distinguishes *Nixon* by noting that there, appellant engaged in a single violent act (shooting into a car) that meant he simultaneously committed each PFCV offense. This case, appellee argues, is governed by *Stevenson v. United States*, 760 A.2d 1034 (D.C.2000) and *Sanders v. United States*, 809 A.2d 584 (D.C.2002), *cert. denied*, 538 U.S. 937, 123 S.Ct. 1602, 155 L.Ed.2d 340 (2003). In *Stevenson* and *Sanders*, we found that PFCV convictions based on armed burglaries followed by armed robberies did not merge. Appellants argue that here there was no time for a "fresh impulse" to develop and be acted upon because the shooting occurred close to the burglary. This argument fails because, as in those cases, there was a sufficient "fork in the road" here. *Stevenson*, 760 A.2d at 1037; *Sanders*, 809 A.2d at 604. Appellants entered with guns but the action of firing them to kill Pinkney was a distinct one. The evidence did not show that the appellants burst into the house with guns already blazing away, which might be more like *Nixon*. Thus, the PFCV convictions do not merge here.

Accordingly, the case is remanded for the sole purpose of providing the trial court the opportunity to vacate the felony murder count with respect to each appellant. In all other respects, the judgments appealed from are affirmed.

*So ordered.*

---

**30.** Appellants aver that the government conceded at trial that the PFCV convictions should merge. Franklin states that the government cannot now rely on other arguments. *President & Dir. of Georgetown College v. D.C. Board of Zoning Adjustment*, 837 A.2d 58, 72 (D.C.2003) ("[c]ourts do not look with favor on abrupt reversals of direction by litigants as they proceed from one court to the next" and that "[i]n general, parties may not assert one theory at trial and another on appeal") (citation omitted). However, the government's "concession" at trial was only that merger "might apply" to multiple PFCV convictions and was made in the context of the trial court's inquiry about *Stevenson, infra*.